# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

NO. 23-13706-J

_____

UNITED STATES OF AMERICA,

Prosecution/Appellee,

versus

JOSHUA HERRERA,

Defendant-Appellant.

_____

A DIRECT APPEAL OF A CRIMINAL CASE
FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION

_____

APPENDIX FROM
THE APPELLANT-DEFENDANT

ADAM M. HAMES
Georgia State Bar No. 320498
The Hames Law Firm LLC
511 East Paces Ferry Road, N.E.
Atlanta, Georgia 30305
(404)842-9577
Attorney for Joshua Herrera

INDEX TO RECORD EXCERPTS

Volume I

District Court Docket                                    A

Indictment                                               Doc.  # 10

Order of the District Court                              Doc. # 111

Report of Dr. Tyler T. Whitney (**UNDER SEAL**)          Doc. # 109

Trial Transcript Excerpts
    Related Ruling of the District Court                 Doc. #  141 p. 8-12

    Initial testimony of SA Megan Perry                  Doc. # 142 p. 395-403

    Testimony of Dr. Tyler Whitney                       Doc. # 143 p. 504-542

Judgment and Commitment                                  Doc. # 147

# District Court

# Docket

# TAB A

## U.S. District Court
## Northern District of Georgia (Atlanta)
## CRIMINAL DOCKET FOR CASE #: 1:20-cr-00079-SDG-RDC-1

Case title: USA v. Herrera

Magistrate judge case number: 1:20-mj-00033-JSA

Date Filed: 02/12/2020

Date Terminated: 10/27/2023

Assigned to: Judge Steven D. Grimberg
Referred to: Magistrate Judge Regina D
Cannon

Appeals court case numbers: 23-13706-J
USCA- 11th Circuit, 23-13706-JJ USCA-
11th Circuit

### Defendant (1)

**Joshua Herrera**
*TERMINATED: 10/27/2023*
*also known as*
Joshua Reuben Herrera
*TERMINATED: 10/27/2023*

represented by **Richard Brooks Holcomb**
Federal Defender Program Inc.-Atl
Suite 1500, Centennial Tower
101 Marietta Street, NW
Atlanta, GA 30303
404-688-7530
Fax: 404-688-0768
Email: richardholcomb@yahoo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

**Adam Marshall Hames**
The Hames Law Firm, LLC
511 East Paces Ferry Road N.E.
Atlanta, GA 30305
404-842-9577
Fax: 404-842-9599
Email: adam@amh-law.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Caitlyn Virginia Wade**
Federal Defender Program
101 Marietta Street Northwest
Suite 1500
Atlanta, GA 30303
404-688-7530
Fax: 404-688-0768
Email: caitlyn_wade@fd.org
*ATTORNEY TO BE NOTICED*

**Sean Jengwei Young**
Federal Defender Program, Inc.
101 Marietta Street NW
Ste 1500
Atlanta, GA 30303
404-688-7530
Fax: 404-688-0768
Email: sean_young@fd.org
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
|---|---|
| 18:2422(b) COERCION OR ENTICEMENT OF FEMALE (1) | CBOP 235 MONTHS. SR LIFE. SA $100. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| 18:2422(b) | |

---

**Plaintiff**

| | | |
|---|---|---|
| **USA** | represented by | **Ryan Karim Buchanan** |

Office of the United States Attorney-ATL600
Northern District of Georgia
600 United States Courthouse
75 Ted Turner Dr., S.W.
Atlanta, GA 30303
404-581-6217
Email: ryan.buchanan@usdoj.gov
*TERMINATED: 06/02/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Erin Sanders**
Office of the United States Attorney-ATL600

Northern District of Georgia
600 United States Courthouse
75 Ted Turner Dr., S.W.
Atlanta, GA 30303
404-581-6000
Email: erin.sanders@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Jesika W. French**
United States Attorney -Atl
75 Ted Turner Drive Southwest
600 U.S. Courthouse
Atlanta, GA 30303
404-581-6168
Email: jesika.french@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Stephanie Elaine Gabay-Smith**
Office of the United States Attorney-
ATL600
Northern District of Georgia
600 United States Courthouse
75 Ted Turner Dr., S.W.
Atlanta, GA 30303
404-581-6000
Email: stephanie.smith@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/17/2020 | 1 | MAGISTRATE COMPLAINT as to Joshua Reuben Herrera (1). (ddm) [1:20-mj-00033-JSA] (Entered: 01/17/2020) |
| 01/17/2020 | 2 | Minute Entry for proceedings held before Magistrate Judge Justin S. Anand: INITIAL APPEARANCE as to Joshua Reuben Herrera. Preliminary Examination set for 1/23/2020 at 11:00 AM before Magistrate Judge Justin S. Anand. Government motion for detention filed. Pretrial hearing set for 1/23/20 at 11:00 a.m. Temporary commitment issued. Remanded to USM. (Tape #FTR) (jpa) [1:20-mj-00033-JSA] (Entered: 01/21/2020) |
| 01/17/2020 | 3 | ORDER APPOINTING FEDERAL PUBLIC DEFENDER Richard Brooks Holcomb for Joshua Reuben Herrera. Signed by Magistrate Judge Justin S. Anand on 1/17/20. (jpa) [1:20-mj-00033-JSA] (Entered: 01/21/2020) |
| 01/17/2020 | 4 | MOTION for Detention by USA as to Joshua Reuben Herrera. (jpa) [1:20-mj-00033-JSA] (Entered: 01/21/2020) |
| 01/17/2020 | 5 | Order of Temporary Detention pursuant to Bail Reform Act by Judge Justin S. Anand as to Joshua Reuben Herrera. Detention Hearing set for 1/23/2020 at 11:00 AM in ATLA Courtroom 1875 before Magistrate Judge Justin S. Anand. (jpa) [1:20-mj-00033-JSA] (Entered: 01/21/2020) |
| 01/23/2020 | 6 | Minute Entry for proceedings held before Magistrate Judge Justin S. Anand: denying 4 Governments Motion for Detention as to Joshua Reuben Herrera (1). Bond Hearing. Non- |

| | | |
|---|---|---|
| | | Surety Bond Set at $10,000.00. Bond Filed. Defendant released. (Tape #FTR) (bdb) [1:20-mj-00033-JSA] (Entered: 01/27/2020) |
| 01/23/2020 | 7 | Non-Surety Bond Entered as to Joshua Reuben Herrera in amount of $ 10,000.00. (bdb) [1:20-mj-00033-JSA] (Entered: 01/27/2020) |
| 01/23/2020 | 8 | ORDER Setting Conditions of Release as to Joshua Reuben Herrera. Signed by Magistrate Judge Justin S. Anand on 1/23/2020. (bdb) [1:20-mj-00033-JSA] (Entered: 01/27/2020) |
| 02/04/2020 | 9 | Notice for Leave of Absence for the following date(s): April 6-10, 2020, by Richard Brooks Holcomb. (Holcomb, Richard) [1:20-mj-00033-JSA] (Entered: 02/04/2020) |
| 02/12/2020 | 10 | INDICTMENT as to Joshua Herrera (1) count 1 with Forfeiture. (bdb) (Entered: 02/18/2020) |
| 02/12/2020 | 11 | Defendant Information Sheet as to Joshua Herrera. (bdb) (Entered: 02/18/2020) |
| 02/12/2020 | 12 | Request for Arraignment as to Joshua Herrera. (bdb) (Entered: 02/18/2020) |
| 02/14/2020 | 13 | Summons Issued as to Joshua Herrera. Arraignment set for 2/24/2020 at 09:00 AM in ATLA Courtroom 2008 before Magistrate Judge Christopher C. Bly. (bdb) (Entered: 02/18/2020) |
| 02/24/2020 | 14 | Minute Entry for proceedings held before Magistrate Judge Christopher C. Bly: ARRAIGNMENT with a PLEA of NOT GUILTY by Joshua Herrera (1) Count 1. (Attachments: # 1 Plea with Counsel) (Tape #FTR) (rlb) (Entered: 02/25/2020) |
| 02/24/2020 | | Case as to Joshua Herrera Reassigned to District Judge Steven D. Grimberg and Magistrate Judge Regina D Cannon. (rlb) (Entered: 02/25/2020) |
| 02/28/2020 | 15 | PRETRIAL SCHEDULING ORDER as to Joshua Herrera. Pretrial Conference set for Monday, March 9, 2020, at 9:30 A.M., in ATLA Courtroom 2008 before Magistrate Judge Regina D Cannon. Pretrial motions shall be due on or before March 7, 2020. Signed by Magistrate Judge Regina D Cannon on 2/28/20. (rlb) (Entered: 02/28/2020) |
| 03/03/2020 | 16 | Notice for Leave of Absence for the following date(s): 04/06/2020 to 04/10/2020, by Ryan Karim Buchanan. (Buchanan, Ryan) (Entered: 03/03/2020) |
| 03/06/2020 | 17 | Unopposed MOTION to Continue Pretrial Conference and Pretrial Motions Deadline by Joshua Herrera. (Attachments: # 1 Text of Proposed Order) (Holcomb, Richard) (Entered: 03/06/2020) |
| 03/06/2020 | 18 | ORDER GRANTING 17 Motion for Continuance of Pretrial Conference as to Joshua Herrera (1). Counsel for Mr. Herrera is hereby DIRECTED to file any pretrial motions on or before 3/23/2020. The Pretrial Conference is rescheduled for 3/25/2020 at 10:00 AM in ATLA Courtroom 2022 before Magistrate Judge Regina D Cannon. Signed by Magistrate Judge Regina D Cannon on 3/6/2020. (adg) (Entered: 03/09/2020) |
| 03/18/2020 | 19 | MAGISTRATE JUDGE'S STANDING ORDER 20-01 as to Joshua Herrera. Signed by Magistrate Judge Regina D Cannon on 3/17/2020. (adg) (Entered: 03/18/2020) |
| 03/20/2020 | 20 | General Order 20-01 re: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONA VIRUS. Time excluded from 3/16/2020 until 4/16/2020 as to Joshua Herrera. Signed by Judge Thomas W. Thrash, Jr. on 3/16/2020. (adg) (Entered: 03/20/2020) |
| 03/20/2020 | 21 | General Order 20-01 re: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONA VIRUS. |

| | | |
|---|---|---|
| | | Time excluded from 3/16/2020 until 4/6/2020 as to Joshua Herrera. Signed by Judge Thomas W. Thrash, Jr. on 3/16/2020. (adg) (Entered: 03/20/2020) |
| 03/23/2020 | 22 | Unopposed MOTION to Continue Pretrial Conference and Pretrial Motions Deadline, *Second* by Joshua Herrera. (Attachments: # 1 Text of Proposed Order) (Holcomb, Richard) (Entered: 03/23/2020) |
| 03/24/2020 | 23 | ORDER GRANTING 22 Motion for Continuance of Pretrial Conference as to Joshua Herrera (1).Counsel for Mr. Herrera is hereby DIRECTED to file anypre-trial motions on or before 4/22/2020. Pretrial Conference reset for 4/24/2020 at 02:30 PM in ATLA Courtroom 2008 before Magistrate Judge Regina D Cannon. Time excluded from 3/16/2020 through 4/24/2020, pursuant to 18, United States Code, Section 3161(h)(8)(A) and (B). Signed by Magistrate Judge Regina D Cannon on 3/24/2020. (adg) (Entered: 03/24/2020) |
| 03/30/2020 | 24 | Unopposed MOTION to Modify Conditions of Release by Joshua Herrera. (Attachments: # 1 Text of Proposed Order) (Holcomb, Richard) (Entered: 03/30/2020) |
| 03/31/2020 | 25 | ORDER GRANTING 24 Motion to Modify Conditions of Release as to Joshua Herrera (1). He is permitted to use a dedicated electronic device for educational purposes relating to completion of his degree program only; that dedicated device may only be used to access the internet in order to participate in online instruction or to otherwise complete assignments required by his instructors; and that device shall be subject to search at any time or place and through any methodology determined appropriate by his supervising Probation Officer. All other conditions of his pretrial release would remain applicable. Signed by Magistrate Judge Justin S. Anand on 3/31/2020. (adg) (Entered: 03/31/2020) |
| 04/01/2020 | 26 | Notice for Leave of Absence for the following date(s): 08/25/2020 to 08/28/2020, by Ryan Karim Buchanan. (Buchanan, Ryan) (Entered: 04/01/2020) |
| 04/02/2020 | 27 | Amended General Order 20-01 re COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONA VIRUS. Signed by Judge Thomas W. Thrash, Jr. on 3/30/20. as to Joshua Herrera (rvb) (ADI) (Entered: 04/02/2020) |
| 04/22/2020 | 28 | Unopposed MOTION to Continue Pretrial Conference and Pretrial Motions Deadline, *Third* by Joshua Herrera. (Attachments: # 1 Text of Proposed Order) (Holcomb, Richard) (Entered: 04/22/2020) |
| 04/23/2020 | 29 | ORDER granting 28 Defendant's Unopposed Motion to Continue the Pretrial Conference and to Extend the Deadline for Filing Pretrial Motions. Counsel for Mr. Herrera is hereby DIRECTED to file any pre-trial motions on or before May 28, 2020, and the pretrial conference shall be rescheduled for June 2, 2020 at 11:00 a. m. Time is excluded from 4/23/2020 until 6/2/2020 pursuant to Title 18, United States Code, Section 3161(h)(8)(A) and (B). Signed by Magistrate Judge Regina D Cannon on 4/23/2020. (jed) Modified on 6/2/2020 to edit text (jed). (Entered: 04/24/2020) |
| 05/04/2020 | 30 | SECOND AMENDMENT TO GENERAL ORDER 20-01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONA VIRUS. The time period of the continuances implemented by this General Order will be excluded under the Speedy Trial Act as to Joshua Herrera. Signed by Judge Thomas W. Thrash, Jr. on 4/30/2020. (bdb) (Entered: 05/04/2020) |
| 05/26/2020 | 31 | THIRD AMENDMENT TO GENERAL ORDER 20-01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONA VIRUS. The time period of the continuances implemented by this General Order will be excluded under the Speedy Trial Act as to Joshua Herrera. Signed by Judge Thomas W. Thrash, Jr. on 5/26/2020. (adg) (Entered: 05/26/2020) |

| 05/28/2020 | 32 | MOTION to Suppress Search and Seizure *and Evidence* by Joshua Herrera. (Holcomb, Richard) (Entered: 05/28/2020) |
|---|---|---|
| 05/28/2020 | 33 | MOTION to Suppress Statements by Joshua Herrera. (Holcomb, Richard) (Entered: 05/28/2020) |
| 06/02/2020 | 34 | Minute Entry for proceedings held before Magistrate Judge Regina D Cannon: A telephonic pretrial conference was held as to Joshua Herrera. The Government has provided Rule 16 discovery and advised that there is no 404(b) evidence. The Government has an expert/witness prepared to testify about cell phone extraction. The Defendant does not have reciprocal discovery. Evidentiary Hearing set for 8/6/2020 at 10:00 AM in ATLA Courtroom 2008 before Magistrate Judge Regina D Cannon. Motions taken under advisement: 32 Motion to Suppress Search and Seizure and 33 Motion to Suppress Statements. (Tape #FTR) (jed) (Entered: 06/02/2020) |
| 07/01/2020 | 35 | FOURTH AMENDMENT TO GENERAL ORDER 20-01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONA VIRUS. The time period of the continuances implemented by this General Order will be excluded under the Speedy Trial Act as to Joshua Herrera. Signed by Judge Thomas W. Thrash, Jr. on 7/1/2020. (jed) (Entered: 07/01/2020) |
| 07/13/2020 | 36 | FIFTH AMENDMENT TO GENERAL ORDER 20-01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONA VIRUS. The time period of the continuances implemented by this General Order will be excluded under the Speedy Trial Act as to Joshua Herrera. Signed by Judge Thomas W. Thrash, Jr. on 7/10/2020. (jed) (Entered: 07/13/2020) |
| 07/14/2020 | 37 | Notice for Leave of Absence for the following date(s): July 21-31, 2020, by Richard Brooks Holcomb. (Holcomb, Richard) (Entered: 07/14/2020) |
| 07/21/2020 | | Document 38 is sealed. (jpa) (Entered: 07/21/2020) |
| 08/04/2020 | 39 | SIXTH AMENDMENT TO GENERAL ORDER 20-01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONA VIRUS. The time period of the continuances implemented by this General Order will be excluded under the Speedy Trial Act as to Joshua Herrera. Signed by Judge Thomas W. Thrash, Jr. on 8/3/2020. (tcc) (Entered: 08/04/2020) |
| 08/21/2020 | | NOTICE OF HEARING ON MOTION as to Joshua Herrera 32 MOTION to Suppress Search and Seizure *and Evidence*, 33 MOTION to Suppress Statements : The Motion Hearing previously scheduled for August 6, 2020 is re-set for 9/23/2020 at 10:00 AM in ATLA Courtroom 2022 before Magistrate Judge Regina D Cannon. (pmb) Modified on 8/21/2020 to edit date (pmb). (Entered: 08/21/2020) |
| 09/02/2020 | 40 | SEVENTH AMENDMENT TO GENERAL ORDER 20-01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONA VIRUS. The time period of the continuances implemented by this General Order will be excluded under the Speedy Trial Act as to Joshua Herrera. Signed by Judge Thomas W. Thrash, Jr. on 9/1/2020. (bdb) (Entered: 09/02/2020) |
| 09/22/2020 | | NOTICE OF CANCELLATION of Hearing re: NOTICE OF HEARING ON MOTION as to Joshua Herrera 32 MOTION to Suppress Search and Seizure *and Evidence*, 33 MOTION to Suppress Statements : The Motion Hearing previously scheduled for August 6, 2020 is reset to 9/23/2020 at 10:00 AM in ATLA Courtroom 2022 before Magistrate Judge Regina D Cannon. The hearing will be reset to a date to be determined by the Court (pmb) (Entered: 09/22/2020) |

| 09/29/2020 | 41 | EIGHTH AMENDMENT TO GENERAL ORDER 20-01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONA VIRUS. The time period of the continuances implemented by this General Order will be excluded under the Speedy Trial Act as to Joshua Herrera. Signed by Judge Thomas W. Thrash, Jr. on 9/28/2020. (bdb) (Entered: 09/29/2020) |
|---|---|---|
| 10/14/2020 | 42 | ORDER RESCHEDULING EVIDENTIARY HEARING AND EXCLUDABLE DELAY ORDER: Evidentiary Hearing as to Joshua Herrera is rescheduled for 12/3/2020 at 11:00 AM in ATLA Courtroom 2008 before Magistrate Judge Regina D Cannon. The Clerk is DIRECTED to exclude the additional time between September 23, 2020 and December 3, 2020 pursuant to 18 U.S.C. § 3161(h)(7)(A), (B)(iv). Signed by Magistrate Judge Regina D Cannon on 10/14/2020. (jed) Modified on 10/19/2020 to edit text (jed). (Entered: 10/14/2020) |
| 12/02/2020 | 43 | Unopposed MOTION to Continue Evidentiary Hearing by Joshua Herrera. (Attachments: # 1 Text of Proposed Order) (Holcomb, Richard) (Entered: 12/02/2020) |
| 12/03/2020 | 44 | ORDER granting 43 Motion to Continue Evidentiary Hearing as to Joshua Herrera (1). The Evidentiary Hearing is reset for 2/25/2021 at 10:00 AM in ATLA Courtroom 2022 before Magistrate Judge Regina D Cannon. The Clerk is DIRECTED to exclude from computation under the Speedy Trial Act this period of delay from December 3, 2020 through February 25, 2021.. Signed by Magistrate Judge Regina D Cannon on 12/3/2020. (jed) (Entered: 12/04/2020) |
| 12/08/2020 | 45 | NINTH AMENDMENT TO GENERAL ORDER 20-01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONAVIRUS. The time period of the continuances implemented by this General Order will be excluded under the Speedy Trial Act as to Joshua Herrera. Signed by Judge Thomas W. Thrash, Jr. on 12/8/2020. (jed) (Entered: 12/08/2020) |
| 12/15/2020 | 46 | Notice for Leave of Absence for the following date(s): June 16, 2021, August 27, 2021, November 4, 2021, December 9, 2021, February 10, 2022, March 17, 2022 and April 25, 2022, by Ryan Karim Buchanan. (Buchanan, Ryan) (Entered: 12/15/2020) |
| 01/28/2021 | 47 | TENTH AMENDMENT TO GENERAL ORDER 20-01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONAVIRUS. The time period of the continuances implemented by this General Order will be excluded under the Speedy Trial Act. Signed by Judge Thomas W. Thrash, Jr. on 01/27/2021. (jed) (Entered: 01/28/2021) |
| 02/18/2021 | 48 | Unopposed MOTION to Continue Evidentiary Hearing, Second by Joshua Herrera. (Attachments: # 1 Text of Proposed Order) (Holcomb, Richard) (Entered: 02/18/2021) |
| 02/22/2021 | 49 | ORDER granting 48 Motion to Continue Evidentiary Hearing as to Joshua Herrera (1). Evidentiary Hearing set for 5/26/2021 at 10:00 AM in ATLA Courtroom 2105 before Magistrate Judge Regina D Cannon. The Clerk is DIRECTED to exclude from computation under the Speedy Trial Act the period of delay beginning February 22, 2021 through May 26, 2021. Signed by Magistrate Judge Regina D Cannon on 2/22/2021. (jeh) (Entered: 02/22/2021) |
| 03/09/2021 | 50 | ELEVENTH AMENDMENT TO GENERAL ORDER 20-01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONA VIRUS. The time period of the continuances implemented by this General Order will be excluded under the Speedy Trial Act as to Joshua Herrera. Signed by Judge Thomas W. Thrash, Jr. on 3/9/2021. (adg) (Entered: 03/09/2021) |
| 03/29/2021 | 51 | Notice for Leave of Absence for the following date(s): April 5, 2021 to April 9, 2021, by |

| 05/20/2021 | 52 | Unopposed MOTION to Continue Evidentiary Hearing with Brief In Support by Joshua Herrera. (Attachments: # 1 Text of Proposed Order) (Holcomb, Richard) (Entered: 05/20/2021) |
|---|---|---|
| 05/21/2021 | 53 | ORDER as to Joshua Herrera re 32 MOTION to Suppress Search and Seizure *and Evidence* filed by Joshua Herrera, 33 MOTION to Suppress Statements filed by Joshua Herrera and 52 Unopposed MOTION to Continue Evidentiary Hearing filed by Joshua Herrera. It is HEREBY ORDERED that the pending motions be submitted to the undersigned and that the referral to Magistrate Regina D. Cannon be terminated. The hearing currently scheduled on Defendant's motions will be reset by separate order. The Clerk is DIRECTED to terminate the referral of Magistrate Judge Regina D. Cannon. Signed by Judge Steven D. Grimberg on 05/21/2021. (bdb) (Entered: 05/21/2021) |
| 05/21/2021 | | Submission of 32 MOTION to Suppress Search and Seizure *and Evidence*, 52 Unopposed MOTION to Continue Evidentiary Hearing and 33 MOTION to Suppress Statements as to Joshua Herrera, to District Judge Steven D. Grimberg. (bdb) (Entered: 05/21/2021) |
| 05/24/2021 | 54 | ORDER granting 52 Defendant's Third Unopposed Motion for Continuance of Evidentiary Hearing as to Joshua Herrera (1). Time excluded from 5/20/2021 to 8/10/2021. Evidentiary Hearing set for Tuesday, August 10, 2021 at 02:00 PM in ATLA Courtroom 1707 before Judge Steven D. Grimberg. Signed by Judge Steven D. Grimberg on 05/24/2021. (bdb) (Entered: 05/24/2021) |
| 05/24/2021 | 55 | Notice for Leave of Absence for the following date(s): June 10-11 and July 26-30, 2021, by Richard Brooks Holcomb. (Holcomb, Richard) (Entered: 05/24/2021) |
| 07/20/2021 | 56 | ORDER SETTING JURY TRIAL: The jury trial of this case for Defendant Joshua Herrera is set for December 1, 2021, at 1:00 p.m., in Courtroom 1707. The pretrial conference is set for November 15, 2021, at 10:00 a.m., in Courtroom 1707. The Court may schedule additional pretrial conferences as necessary. The time period between July 20, 2021 and December 1, 2021 will be excluded under the Speedy Trial Act. Signed by Judge Steven D. Grimberg on 7/20/2021. (rjc) (Entered: 07/21/2021) |
| 08/05/2021 | 57 | Withdrawal of Motion 32 MOTION to Suppress Search and Seizure *and Evidence* filed by Joshua Herrera, 33 MOTION to Suppress Statements filed by Joshua Herrera as to Joshua Herrera (Holcomb, Richard) (Entered: 08/05/2021) |
| 08/06/2021 | | NOTICE OF CANCELLATION of Hearing: The evidentiary hearing previously set for Tuesday, August 10, 2021 at 02:00 PM is CANCELLED. (ash) (Entered: 08/06/2021) |
| 08/11/2021 | 58 | ORDER CERTIFYING CASE READY FOR TRIAL as to Joshua Herrera. Signed by Magistrate Judge Regina D Cannon on 8/11/2021. (adg) (Entered: 08/11/2021) |
| 11/10/2021 | 59 | Notice for Leave of Absence for the following date(s): November 23-26 and December 20-31, 2021, by Richard Brooks Holcomb. (Holcomb, Richard) (Entered: 11/10/2021) |
| 11/12/2021 | | Oral MOTION to Continue Trial by USA and Joshua Herrera. (adg) (Entered: 11/15/2021) |
| 11/15/2021 | 60 | ORDER GRANTING Oral Motion for Continuance of Trial as to Joshua Herrera (1). Jury Trial reset for 2/15/2022 at 01:00 PM in ATLA Courtroom 1706 before Judge Steven D. Grimberg. Pretrial Conference reset for 2/3/2022 at 02:00 PM in ATLA Courtroom 1706 before Judge Steven D. Grimberg. Pre-Trial Deadlines: Motions in Limine (if any)- 1/20/2022; Responses to Motions in Limine (if any)- 1/27/2022; Consolidated Proposed Voir Dire- 1/31/2022; Consolidated Proposed Jury Charges and Verdict Form- 1/31/2022; Exhibit List and Witness List (to Chambers)-2/11/2022. Time excluded from 7/20/2021 to |

| | | pursuant to 18 U.S.C. § 3161(h)(7)(A). Signed by Judge Steven D. Grimberg on 11/12/2021. (adg) (Entered: 11/15/2021) |
|---|---|---|
| 01/21/2022 | 61 | Minute Entry for proceedings held before Judge Steven D. Grimberg: Status Conference as to Joshua Herrera. The Court heard from the parties regarding the status of the case. The case will remain scheduled for trial on 02/15/2022. (Court Reporter Alicia Bagley) (jkb) (Entered: 01/24/2022) |
| 01/24/2022 | 62 | Unopposed MOTION to Continue Trial Date by Joshua Herrera. (Attachments: # 1 Text of Proposed Order) (Holcomb, Richard) (Entered: 01/24/2022) |
| 01/26/2022 | 63 | ORDER granting 62 Motion for Continuance of Jury Trial as to Joshua Herrera (1) Jury Trial set for 6/28/2022 at 09:00 AM in ATLA Courtroom 1706 before Judge Steven D. Grimberg. Pretrial Conference set for 6/21/2022 at 10:00 AM in ATLA Courtroom 1706 before Judge Steven D. Grimberg. Pre-Trial Deadlines: Motions in Limine (if any): 06/07/2022, Responses to Motions in Limine (if any): 06/14/2022, Consolidated Proposed Voir Dire: 06/17/2022, Consolidated Proposed Jury Charges and Verdict Form: 06/17/2022, Exhibit List and Witness List (to Chambers): 06/24/2022. Signed by Judge Steven D. Grimberg on 01/26/2022. (jkb) (Entered: 01/26/2022) |
| 03/30/2022 | 64 | ORDER Resetting Jury Trial as to Joshua Herrera. Pretrial Conference set for 7/18/2022 at 02:00 PM and Jury Trial set for 8/2/2022 at 09:00 AM in ATLA Courtroom 1706 before Judge Steven D. Grimberg. See order for pre-trial deadlines. Time excluded from 8/11/2021 until 8/2/2022 pursuant to 18 U.S.C. § 3161(h)(7)(A). Signed by Judge Steven D. Grimberg on 3/30/2022. (dmb) (Entered: 03/31/2022) |
| 04/01/2022 | 65 | NOTICE OF ATTORNEY APPEARANCE: Caitlyn Virginia Wade appearing on behalf of Joshua Herrera (Wade, Caitlyn) (Entered: 04/01/2022) |
| 05/17/2022 | 66 | Notice for Leave of Absence for the following date(s): May 26, 2022, June 6, 2022 - June 10, 2022, November 21, 2022 - November 25, 2022, by Caitlyn Virginia Wade. (Wade, Caitlyn) (Entered: 05/17/2022) |
| 06/01/2022 | | NOTICE OF HEARING as to Joshua Herrera. Status Conference set for 6/16/2022 at 02:00 PM before Judge Steven D. Grimberg with attorneys only. No courtroom. The connection instructions have been emailed to the parties. (ash) (Entered: 06/01/2022) |
| 06/02/2022 | 67 | Certification of Consent to Substitution of Counsel for USA as to Joshua Herrera. Stephanie Elaine Gabay-Smith replacing attorney Ryan Karim Buchanan. (Gabay-Smith, Stephanie) (Entered: 06/02/2022) |
| 06/02/2022 | 68 | NOTICE OF ATTORNEY APPEARANCE Jesika W. French appearing for USA. (French, Jesika) (Entered: 06/02/2022) |
| 06/02/2022 | 69 | Notice for Leave of Absence for the following date(s): June 27- July 1, 2022, July 18-22, 2022, and August 15-19, 2022, by Jesika W. French. (French, Jesika) (Entered: 06/02/2022) |
| 06/08/2022 | | NOTICE OF HEARING as to Joshua Herrera. The Status Conference set for 6/16/2022 at 02:00 PM is converted to an in person hearing. The hearing will be held in ATLA Courtroom 1706 before Judge Steven D. Grimberg. Defendant shall also be present for the hearing. (ash) (Entered: 06/08/2022) |
| 06/16/2022 | 70 | ORAL MOTION to Continue trial by Joshua Herrera. (jkb) (Entered: 06/16/2022) |
| 06/16/2022 | 71 | Minute Entry for proceedings held before Judge Steven D. Grimberg: Status Conference as to Joshua Herrera. denying 70 Motion for Continuance of trial as to Joshua Herrera (1). (Court Reporter Geraldine Glover) (jkb) (Entered: 06/16/2022) |

| 06/23/2022 | 72 | Notice for Leave of Absence for the following date(s): July 6 - July 12, 2022 and August 17 - August 27, 2022, by Stephanie Elaine Gabay-Smith. (Gabay-Smith, Stephanie) (Entered: 06/23/2022) |
|---|---|---|
| 06/23/2022 | 73 | NOTICE of Intention to Use 404(b) Evidence filed by USA as to Joshua Herrera (French, Jesika) (Entered: 06/23/2022) |
| 06/26/2022 | 74 | MOTION for Leave to File Notice of Intent to Present Expert Evidence of Mental Condition with Brief In Support by Joshua Herrera. (Wade, Caitlyn) (Entered: 06/26/2022) |
| 06/26/2022 | 75 | Unopposed MOTION to Continue Trial with Brief In Support by Joshua Herrera. (Wade, Caitlyn) (Entered: 06/26/2022) |
| 06/27/2022 | 76 | Notice for Leave of Absence for the following date(s): July 6 - July 12, 2022 and August 17 - August 27, 2022, by Stephanie Elaine Gabay-Smith. (Gabay-Smith, Stephanie) (Entered: 06/27/2022) |
| 06/28/2022 | | ORDER granting 74 Motion for Leave to File Notice of Intent to Present Expert Evidence of Mental Condition as to Joshua Herrera. The deadline for filing Defendant's notice of intent is July 12, 2022. Ordered by Judge Steven D. Grimberg on June 28, 2022. (ash) (Entered: 06/28/2022) |
| 06/28/2022 | 77 | ORDER Resetting Jury Trial as to Joshua Herrera. Jury Trial set for 11/1/2022 at 09:00 AM in ATLA Courtroom 1706 before Judge Steven D. Grimberg. Pretrial Conference set for 10/17/2022 at 02:00 PM in ATLA Courtroom 1706 before Judge Steven D. Grimberg. Time excluded from 08/11/2021 until 11/01/2022 from computation under the Speedy Trial Act, pursuant to 18 U.S.C. § 3161(h)(7)(A). Signed by Judge Steven D. Grimberg on 06/28/2022. (jkb) (Entered: 06/28/2022) |
| 06/29/2022 | 78 | NOTICE OF ATTORNEY APPEARANCE Erin Sanders appearing for USA. (Sanders, Erin) (Entered: 06/29/2022) |
| 07/12/2022 | 79 | (WITHDRAWN) NOTICE of Intent to Use Expert Testimony as to Joshua Herrera (Wade, Caitlyn) Modified on 10/21/2022 (adg). (Entered: 07/12/2022) |
| 09/26/2022 | 80 | MOTION in Limine *(Consolidated Motions in Limine)* by USA as to Joshua Herrera. (Attachments: # 1 Exhibit A) (Sanders, Erin) (Entered: 09/26/2022) |
| 09/26/2022 | 81 | MOTION in Limine with Brief In Support by Joshua Herrera. (Wade, Caitlyn) (Entered: 09/26/2022) |
| 10/03/2022 | 82 | RESPONSE in Opposition as to Joshua Herrera filed by USA re 81 MOTION in Limine (French, Jesika) (Entered: 10/03/2022) |
| 10/03/2022 | 83 | RESPONSE in Opposition as to Joshua Herrera filed by Joshua Herrera re 80 MOTION in Limine *(Consolidated Motions in Limine)* (Wade, Caitlyn) (Entered: 10/03/2022) |
| 10/03/2022 | 84 | MOTION to Withdraw Document by Joshua Herrera. (Wade, Caitlyn) (Entered: 10/03/2022) |
| 10/10/2022 | 85 | Proposed Voir Dire Questions as to Joshua Herrera by USA. (Gabay-Smith, Stephanie) (Entered: 10/10/2022) |
| 10/13/2022 | 86 | Requests to Charge as to Joshua Herrera filed by USA (French, Jesika) (Entered: 10/13/2022) |
| 10/17/2022 | 88 | Minute Entry for proceedings held before Judge Steven D. Grimberg: Pretrial Conference as to Joshua Herrera (1). The Court OVERRULED the Governments objections to Defendants proposed Voir Dire [ 85 , questions 3, 5, 13, 14, 16, 17, and 20. Defendant |

| | | |
|---|---|---|
| | | withdrew question 19. The Governments withdrew its objection to question 20. Governments objection to question 21 SUSTAINED. Governments 80 Consolidated Motion in Limine DENIED AS MOOT in allrespects except its motion for use of juror questionnaire GRANTED withDefendants proposed revision 83 . Defendants 81 Consolidated Motionin Limine TAKEN UNDER ADVISEMENT as to excluding evidence ofimages found on Defendants cellular phone [Topic 1], GRANTED as toexcluding evidence of video titles found on Defendants cellular phone[Topic 2], and TAKEN UNDER ADVISEMENT as to admittingpolygraph evidence [Topic 3]. GRANTING Defendant's 84 Motion to Withdraw Document. Hearing Concluded. (Court Reporter Alicia Bagley) (adg) (Entered: 10/21/2022) |
| 10/20/2022 | 87 | NOTICE OF ATTORNEY APPEARANCE: Sean Jengwei Young appearing on behalf of Joshua Herrera (Young, Sean) (Entered: 10/20/2022) |
| 10/25/2022 | 89 | OPINION AND ORDER DENYING 81 Motion in Limine as to Joshua Herrera (1). Signed by Judge Steven D. Grimberg on 10/25/2022. (adg) (Entered: 10/25/2022) |
| 10/27/2022 | | Document 92 is sealed. (tmf) (Entered: 10/28/2022) |
| 10/28/2022 | 91 | Notice for Leave of Absence for the following date(s): November 23, 2022, November 25, 2022, and December 19, 2022 - January 4, 2023, by Stephanie Elaine Gabay-Smith. (Gabay-Smith, Stephanie) (Entered: 10/28/2022) |
| 10/28/2022 | | NOTICE OF VIDEO PROCEEDING re: 90 MOTION to Continue Trial as to Joshua Herrera: Motion Hearing set for 10/29/2022 at 01:00 PM in No Courtroom before Judge Steven D. Grimberg. Connection Instructions: https://ganduscourts.zoomgov.com/j/1601451451 Meeting ID: 160 145 1451 Passcode: 171332 You must follow the instructions of the court for remote proceedings available here. The procedure for filing documentary exhibits admitted during the proceeding is available here. *Photographing, recording, or broadcasting of any judicial proceedings, including proceedings held by video teleconferencing or telephone conferencing, is strictly and absolutely prohibited.* (slc) (Entered: 10/28/2022) |
| 10/31/2022 | | Document 90 is sealed. (jpa) (Entered: 10/31/2022) |
| 10/31/2022 | 93 | Notice for Leave of Absence for the following date(s): January 12-17, 2023, by Jesika W. French. (French, Jesika) (Entered: 10/31/2022) |
| 10/31/2022 | 94 | Notice for Leave of Absence for the following date(s): November 22, 2022 through and including November 23, 2022, November 30, 2022 through and including December 14, 2022, February 13, 2023 through and including February 24, 2023, by Sean Jengwei Young. (Young, Sean) (Entered: 10/31/2022) |
| 10/31/2022 | 95 | Notice for Leave of Absence for the following date(s): November 21, 2022 through and including November 25, 2022, December 21, 2022 through and including December 30, 2022, January 13, 2023, February 17, 2023, March 10, 2023, May 8, 2023, July 3, 2023 through and including July 7, 2023, by Caitlyn Virginia Wade. (Wade, Caitlyn) (Entered: 10/31/2022) |
| 11/01/2022 | 96 | Notice for Leave of Absence for the following date(s): March 6, 2023 through and including March 20, 2023, by Sean Jengwei Young. (Young, Sean) (Entered: 11/01/2022) |
| 11/01/2022 | | NOTICE OF CANCELLATION of VIDEO PROCEEDING HEARING re: 90 MOTION to Continue Trial as to Joshua Herrera: Motion Hearing was originally set for 10/29/2022 at 01:00 PM, before Judge Steven D. Grimberg. Hearing was CANCELED because it was no longer needed. (slc) (Entered: 11/01/2022) |
| 11/01/2022 | 97 | Order Resetting Jury Trial as to Joshua Herrera: The jury trial is reset for Thursday, January 5, 2023, at 9:00 A.M., in Courtroom 1706. The pretrial conference is reset for |

| | | |
|---|---|---|
| | | December 6, 2022, at 2:00 P.M., in Courtroom 1706 (see order to pre-trial deadlines) The period of November 1, 2022, to January 5, 2023 is excluded. Signed by Judge Steven D. Grimberg on 11/1/22. (rlh) (Entered: 11/02/2022) |
| 11/10/2022 | 98 | Notice for Leave of Absence for the following date(s): November 21, 2022 through and incuding November 25, 2022, December 21, 2022 through and including December 30, 2022, January 13, 2023, February 17, 2023, March 10, 2023, May 8, 2023, June 5, 2023 through and including June 9, 2023, and July 3, 2023 through and including July 7, 2023, by Caitlyn Virginia Wade. (Wade, Caitlyn) (Entered: 11/10/2022) |
| 12/09/2022 | 99 | MOTION in Limine Defendant's Supplemental *Motion in Limine* by Joshua Herrera. (Young, Sean) (Entered: 12/09/2022) |
| 12/16/2022 | 101 | Minute Entry for proceedings held before Judge Steven D. Grimberg: Pretrial Conference as to Joshua Herrera. Government moved for a continuance of the jury trial due to outstanding defendant expert report; Defendant did not object. Motion was GRANTED. Defendant will have through 12/27/2022 in which to turn over export report to the Government. (Court Reporter Alicia Bagley) (adg) (Entered: 12/28/2022) |
| 12/19/2022 | | ORAL UNOPPOSED MOTION to Continue Trial by USA as to Joshua Herrera. (adg) (Entered: 12/19/2022) |
| 12/19/2022 | 100 | ORDER RESETTING JURY TRIAL. The Govt's Oral Unopposed Motion for Continuance of Trial as to Joshua Herrera (1) is GRANTED. Jury Trial reset for 3/27/2023 at 09:00 AM in ATLA Courtroom 1706 before Judge Steven D. Grimberg. Pretrial Conference reset for 3/13/2023 at 02:00 PM in ATLA Courtroom 1706 before Judge Steven D. Grimberg. See order for Pre-Trial deadlines. Time excluded from 11/1/1022 to 3/27/2023, pursuant to 18 U.S.C. § 3161(h)(7)(A). Signed by Judge Steven D. Grimberg on 12/19/2022. (adg) (Entered: 12/19/2022) |
| 02/27/2023 | | Document 102 is sealed. (bgt) (Entered: 02/27/2023) |
| 03/06/2023 | 103 | RESPONSE in Opposition as to Joshua Herrera filed by USA re 99 MOTION in Limine Defendant's Supplemental *Motion in Limine* (French, Jesika) (Entered: 03/06/2023) |
| 03/06/2023 | 105 | NOTICE of Intent to Use Expert Testimony as to Joshua Herrera (Wade, Caitlyn) (Entered: 03/06/2023) |
| 03/06/2023 | | Document 104 is sealed. (tmf) (Entered: 03/07/2023) |
| 03/09/2023 | | Document 106 is sealed. (tmf) (Entered: 03/10/2023) |
| 03/10/2023 | 107 | Supplemental Proposed Voir Dire Questions as to Joshua Herrera by USA. (Gabay-Smith, Stephanie) (Entered: 03/10/2023) |
| 03/13/2023 | | Document 108 is sealed. (rlh) (Entered: 03/15/2023) |
| 03/15/2023 | | Document 109 is sealed. (tmf) (Entered: 03/16/2023) |
| 03/17/2023 | | Document 110 is sealed. (tmf) (Entered: 03/20/2023) |
| 03/20/2023 | 111 | OPINION AND ORDER as to Joshua Herrera (1): The Government's Supplemental and Renewed Motions in Limine to exclude Dr. Whitney's expert testimony ECFs 102 and 110 are DENIED IN PART AND GRANTED IN PART. Signed by Judge Steven D. Grimberg on 3/20/23. (rlh) (Entered: 03/20/2023) |
| 03/20/2023 | 112 | ORDER ALLOWING AUDIO/VISUAL EQUIPMENT IN THE COURTROOM: Trial for this case is scheduled to begin on March 27, 2023, and is expected to last until March 31, 2023. It is ORDERED that Investigator Michael Hutcheson and Information Technology Staff Cesar Bizarroque Jr., Frederick Chen, Brian Green, and Joel Legall |

USCA11 Case: ... received Document: 18 ... Date Filed: 03/05/2024 ... Page: 16 of 135

| | | |
|---|---|---|
| | | shall be allowed to bring electronic equipment, including but not limited to laptops, printers, cables, phones, and Wi-Fi hot spots, into the United States Courthouse in Atlanta, Georgia starting March 24, 2023 and continuing through the duration of the trial. Signed by Judge Steven D. Grimberg on 3/20/23. (rlh) (Entered: 03/21/2023) |
| 03/20/2023 | | Document 111 is sealed. (rlh) (Entered: 03/21/2023) |
| 03/21/2023 | | Documents 113, 114, and 115 are sealed. (ceo) (Entered: 03/22/2023) |
| 03/23/2023 | 116 | MOTION in Limine Voir Dire of Dr. Whitney by USA as to Joshua Herrera. (Gabay-Smith, Stephanie) (Entered: 03/23/2023) |
| 03/23/2023 | 117 | RESPONSE in Opposition as to Joshua Herrera filed by Joshua Herrera re 116 MOTION in Limine Voir Dire of Dr. Whitney (Wade, Caitlyn) (Entered: 03/23/2023) |
| 03/25/2023 | 118 | ORDER denying 116 Motion in Limine as to Joshua Herrera (1). The Court's reasoning will be given from the bench on March 27, 2023. Signed by Judge Steven D. Grimberg on 03-25-2023. (SDG) (Entered: 03/25/2023) |
| 03/26/2023 | 119 | Proposed Jury Instructions as to Joshua Herrera filed by USA (French, Jesika) (Entered: 03/26/2023) |
| 03/27/2023 | 120 | Notice for Leave of Absence for the following date(s): April 3, 2023 - April 7, 2023, by Stephanie Elaine Gabay-Smith. (Gabay-Smith, Stephanie) (Entered: 03/27/2023) |
| 03/27/2023 | 122 | Minute Entry for proceedings held before Judge Steven D. Grimberg: Jury Trial as to Joshua Herrera began on 3/27/2023. The Court provided reasons for its denial of the Governments 116 Motion in Limine. Jury selection began but not completed. Court recessed until tomorrow, March 28, 2023 at 9:00 A.M. (Court Reporter Alicia Bagley) (rlh) (Entered: 03/28/2023) |
| 03/28/2023 | 121 | Notice for Leave of Absence for the following date(s): August 4, 2023 through and including August 11, 2023; August 21, 2023 through and including August 25, 2023; and September 15, 2023 through and including September 18, 2023, by Sean Jengwei Young. (Young, Sean) (Entered: 03/28/2023) |
| 03/28/2023 | 123 | Consolidated Joint Proposed Jury Charges and Verdict Form as to Joshua Herrera filed by USA (French, Jesika) Modified to edit text on 3/29/2023 (aaq). (Entered: 03/28/2023) |
| 03/28/2023 | | Oral MOTION for Rule 29 Acquittal by Joshua Herrera. (rlh) (Entered: 03/29/2023) |
| 03/28/2023 | 124 | Minute Entry for proceedings held before Judge Steven D. Grimberg: Jury Trial as to Joshua Herrera held on 3/28/2023. Jury selection continued on 03/28/2023. For cause challenges completed and parties exercised their peremptory strikes. Defendant raised a Batson challenge to the Governments strikes. Following argument, Batson challenge DENIED. Jury empaneled and sworn. Opening arguments made. Government opened its case-in-chief. WITNESSES: Ashton Charles, Johanna Norman, William Shores, and Megan Perry, SWORN and TESTIFIED. EXHIBITS: Governments Exhibits 1-12, 12T, and 13, ADMITTED. Government rested. Defendant motioned for a Rule 29 acquittal. Following arguments, the Court DENIED the motion. Trial recessed until Wednesday, March 29, 2023 at 8:45 A.M.(Exhibits retained to be forwarded to the Clerks Office.) (Court Reporter Alicia Bagley) (rlh) (Entered: 03/29/2023) |
| 03/29/2023 | 125 | Minute Entry for proceedings held before Judge Steven D. Grimberg: Jury Trial as to Joshua Herrera held on 3/29/2023. WITNESSES: Dr. Tyler Whitney, Joshua Herrera, Raina Cundriff, and Jocelynn Reil, SWORN, TESTIFIED. Defense rested. Government waived rebuttal case. Charging conference held. Court recessed until tomorrow, March 30, 2023 at 8:45 A.M. Exhibits retained to be forwarded to the Clerks Office. (Court Reporter Alicia Bagley) (rlh) (Entered: 03/30/2023) |

| 03/30/2023 | | ORDER as to Joshua Herrera DIRECTING the Clerk to UNSEAL the 111 Order on Motion in Limine. APPROVED by Judge Steven D. Grimberg on 03/30/2023. (slc) (Entered: 03/30/2023) |
|---|---|---|
| 03/30/2023 | | ORAL MOTION to Remain on Bond by Joshua Herrera. (rlh) (Entered: 03/30/2023) |
| 03/30/2023 | 126 | Minute Entry for proceedings held before Judge Steven D. Grimberg: Jury Trial as to Joshua Herrera held on 3/30/2023 The Court charged the jury. Closing arguments delivered. Jury deliberations began. Jury returned verdict. Defendant found GUILTY of Count One of the Indictment. Jury polled and excused. Defendants oral motion to remain on bond DENIED. Defendant remanded into custody. Sentencing date to be set by separate order. (Exhibits retained to be forwarded to the Clerks Office). (Court Reporter Alicia Bagley) (rlh) (Entered: 03/30/2023) |
| 03/30/2023 | 127 | JURY VERDICT as to Joshua Herrera (1) Guilty on Count 1. (rlh) (Entered: 03/30/2023) |
| 03/30/2023 | 128 | NOTICE OF SENTENCING Set as to Joshua Herrera. Sentencing IS set for 7/11/2023 at 10:00 AM in ATLA Courtroom 1706 before Judge Steven D. Grimberg. (rlh) (Entered: 03/30/2023) |
| 03/30/2023 | 129 | Jury Instructions as to Joshua Herrera. (tas) (Entered: 03/31/2023) |
| 03/30/2023 | | Document 130 is sealed. (tas) (Entered: 03/31/2023) |
| 04/18/2023 | 131 | Exhibits Audio/Video (GOVT 12) admitted and retained at the Jury Trial, 122 124 125 126 , as to Joshua Herrera have been received from Courtroom Deputy and placed in the custody of the Records Clerks. (Attachments: # 1 Exhibit GOVT 12)(djs) (Entered: 04/18/2023) |
| 04/18/2023 | 132 | EXHIBITS (GOVT 1-8 9-1 Thru 9-7,10,11,12T,13-1) admitted and retained at the Jury Trial 122 124 125 126 as to Joshua Herrera have been received from Courtroom Deputy and placed in the custody of the Records Clerks. (Attachments: # 1 Exhibit GOVT 1, # 2 Exhibit GOVT 2, # 3 Exhibit GOVT 3, # 4 Exhibit GOVT 4, # 5 Exhibit GOVT 5, # 6 Exhibit GOVT 6, # 7 Exhibit GOVT 7, # 8 Exhibit GOVT 8, # 9 Exhibit GOVT 9-1 thru 9-7, # 10 Exhibit GOVT 10, # 11 Exhibit GOVT 11, # 12 Exhibit GOVT 12T, # 13 Exhibit GOVT 13-1)(djs) (Entered: 04/18/2023) |
| 04/18/2023 | 133 | NOTICE TO GOVERMENT'S COUNSEL OF RECORD regarding RECLAMATION AND DISPOSITION OF UNCLAIMED Documentary EXHIBITS pursuant to Local Rule 79.1D. Re: 132 Exhibits,, (djs) (Entered: 04/18/2023) |
| 04/19/2023 | 134 | Notice for Leave of Absence for the following date(s): May 1, 2023 - May 5, 2023, by Stephanie Elaine Gabay-Smith. (Gabay-Smith, Stephanie) (Entered: 04/19/2023) |
| 05/03/2023 | 135 | NOTICE OF ATTORNEY APPEARANCE: Adam Marshall Hames appearing on behalf of Joshua Herrera (Hames, Adam) (Entered: 05/03/2023) |
| 05/05/2023 | 136 | Notice for Leave of Absence for the following date(s): May 17, 2023 through October 16, 2023, by Jesika W. French. (French, Jesika) (Entered: 05/05/2023) |
| 05/05/2023 | 137 | Unopposed MOTION to Continue Sentencing by USA as to Joshua Herrera. (French, Jesika) (Entered: 05/05/2023) |
| 05/08/2023 | 138 | ORDER: Upon the 137 Unopposed Motion to Continue Sentencing filed by Jesika W. French, Assistant United States Attorney for the Northern District of Georgia, in the above cited case for a continuance of the sentencing currently scheduled for July 11, 2023 128 , the Motion is GRANTED. The Defendant's sentencing will be continued to October 25, 2023, at 10:00 A.M., in Courtroom 1706, United States Courthouse, 75 Ted Turner |

| | | Drive, Atlanta, Georgia. Signed by Judge Steven D. Grimberg on 5/8/23. (jra) (Entered: 05/08/2023) |
|---|---|---|
| 05/08/2023 | | Set/Reset Deadlines/Hearings as to Joshua Herrera: Sentencing set for 10/25/2023 at 10:00 AM in ATLA Courtroom 1706 before Judge Steven D. Grimberg. (jra) (Entered: 05/08/2023) |
| 06/07/2023 | | Government's documentary exhibits <u>132</u> from the Jury Trial held March 28-30, 2023, as to Joshua Herrera were destroyed as directed in <u>133</u> Exhibit Return Notification (mec) (Entered: 06/07/2023) |
| 06/15/2023 | <u>139</u> | Notice for Leave of Absence for the following date(s): June 28-30, 2023, July 3-7, 2023, July 10, 2023, July 13-14, 2023, July 17, 2023, and July 28, 2023, by Stephanie Elaine Gabay-Smith. (Gabay-Smith, Stephanie) (Entered: 06/15/2023) |
| 06/27/2023 | <u>140</u> | Notice for Leave of Absence for the following date(s): September 4, 2023, through September 22, 2023, October 19, 2023, through October 24, 2023 and October 31, 2023, by Stephanie Elaine Gabay-Smith. (Gabay-Smith, Stephanie) (Entered: 06/27/2023) |
| 07/14/2023 | <u>141</u> | TRANSCRIPT of Proceedings as to Joshua Herrera held on 3/27/23 (Jury Trial) Vol 1 of 4, Pgs 1-260, before Judge Steven D. Grimberg. Court Reporter/Transcriber Alicia B. Bagley. A full directory of court reporters and their contact information can be found at www.gand.uscourts.gov/directory-court-reporters. Redaction Request due 8/4/2023. Redacted Transcript Deadline set for 8/14/2023. Release of Transcript Restriction set for 10/12/2023. (Attachments: # <u>1</u> Notice of Filing Transcript) (pjm) (Additional attachment(s) added on 10/17/2023: # <u>2</u> Verification of Financial Arrangements) (pjm). (Entered: 07/14/2023) |
| 07/14/2023 | <u>142</u> | TRANSCRIPT of Proceedings as to Joshua Herrera held on 3/28/23 (Jury Trial) Vol 2 of 4, Pgs 261-486, before Judge Steven D. Grimberg. Court Reporter/Transcriber Alicia B. Bagley. A full directory of court reporters and their contact information can be found at www.gand.uscourts.gov/directory-court-reporters. Redaction Request due 8/4/2023. Redacted Transcript Deadline set for 8/14/2023. Release of Transcript Restriction set for 10/12/2023. (Attachments: # <u>1</u> Notice of Filing Transcript) (pjm) (Entered: 07/14/2023) |
| 07/14/2023 | <u>143</u> | TRANSCRIPT of Proceedings as to Joshua Herrera held on 3/29/23 (Jury Trial) Vol 3 of 4, Pgs 487-663, before Judge Steven D. Grimberg. Court Reporter/Transcriber Alicia B. Bagley. A full directory of court reporters and their contact information can be found at www.gand.uscourts.gov/directory-court-reporters. Redaction Request due 8/4/2023. Redacted Transcript Deadline set for 8/14/2023. Release of Transcript Restriction set for 10/12/2023. (Attachments: # <u>1</u> Notice of Filing Transcript) (pjm) (Entered: 07/14/2023) |
| 07/14/2023 | <u>144</u> | TRANSCRIPT of Proceedings as to Joshua Herrera held on 3/30/23 (Jury Trial) Vol 4 of 4, Pgs 664-730, before Judge Steven D. Grimberg. Court Reporter/Transcriber Alicia B. Bagley. A full directory of court reporters and their contact information can be found at www.gand.uscourts.gov/directory-court-reporters. Redaction Request due 8/4/2023. Redacted Transcript Deadline set for 8/14/2023. Release of Transcript Restriction set for 10/12/2023. (Attachments: # <u>1</u> Notice of Filing Transcript) (pjm) (Entered: 07/14/2023) |
| 08/16/2023 | | ORDER: The sentencing hearing, previously set for October 25, 2023, is CONTINUED to October 26, 2023, at 11:00 A.M., in Courtroom 1706 before Judge Steven D. Grimberg. APPROVED by Judge Steven D. Grimberg on 08/16/2023. (slc) (Entered: 08/16/2023) |
| 10/23/2023 | <u>145</u> | Sentencing Memorandum as to Joshua Herrera filed by USA (French, Jesika) (Entered: 10/23/2023) |

| | | |
|---|---|---|
| 10/26/2023 | 146 | Minute Entry for proceedings held before Judge Steven D. Grimberg: Sentencing hearing held as to Joshua Herrera. Sentencing hearing held on October 26, 2023. No objections raised by the parties to the Presentence Report (PSR). After considering the parties' positions, the Court added an obstruction enhancement to defendant's guidelines calculations. No objection raised by the parties to the guidelines calculations as announced by the Court. WITNESS: Tyler Whitney, SWORN, TESTIFIED. Defendant sentenced to 235 months' imprisonment, supervised release for life, and a special assessment of $100.00. Parties raised no objections to the sentence. Judgment and Commitment Order to be entered separately. (Court Reporter Alicia Bagley) (tas) (Entered: 10/27/2023) |
| 10/27/2023 | 147 | JUDGMENT AND COMMITMENT as to Joshua Herrera (1), Count 1, CBOP 235 MONTHS. SR LIFE. SA $100. Court Recommendations: That defendant be evaluated and, if appropriate, designated to a facility that offers the BOP Skills Program and defendant be designated to a facility as close to Atlanta, Georgia as practicable. Defendant is remanded to the custody of the United States Marshal. Signed by Judge Steven D. Grimberg on 10/27/2023. --Please refer to http://www.ca11.uscourts.gov to obtain an appeals jurisdiction checklist-- c:Financial Office (tas) (Entered: 10/27/2023) |
| 11/08/2023 | 148 | NOTICE OF APPEAL as to Joshua Herrera re 147 Judgment and Commitment,,. Filing fee $ 505, receipt number AGANDC-13018754. Transcript Order Form due on 11/22/2023 (Hames, Adam) (Entered: 11/08/2023) |
| 11/08/2023 | 149 | USCA Appeal Transmission Letter as to Joshua Herrera to USCA- 11th Circuit re: 148 Notice of Appeal filed by Joshua Herrera. (pjm) (Entered: 11/08/2023) |
| 11/08/2023 | 150 | Transmission of Certified Copy of Notice of Appeal, USCA Appeal Fees, J&C and Docket Sheet as to Joshua Herrera to US Court of Appeals re: 148 Notice of Appeal. (pjm) (Entered: 11/08/2023) |
| 11/08/2023 | | Request For Presentence Investigation Report as to Joshua Herrera re: 148 Notice of Appeal filed on 11/8/23. (pjm) (Entered: 11/08/2023) |
| 11/08/2023 | 151 | PRESENTENCE INVESTIGATION REPORT (Sealed) as to Joshua Herrera. (ddm) (Entered: 11/08/2023) |
| 11/09/2023 | 152 | USCA Acknowledgment of Receipt of Notice of Appeal as to Joshua Herrera for 148 Notice of Appeal filed by Joshua Herrera. Case Appealed to USCA- 11th Circuit. Case Number 23-13706-J. (pjm) (Entered: 11/09/2023) |
| 11/14/2023 | 153 | Notice for Leave of Absence for the following date(s): November 22, 2023 - November 27, 2023, and December 22, 2023 - January 8, 2024, by Stephanie Elaine Gabay-Smith. (Gabay-Smith, Stephanie) (Entered: 11/14/2023) |
| 11/21/2023 | 154 | TRANSCRIPT ORDER FORM as to Joshua Herrera for proceedings held on October 26, 2023 before Judge Steven D. Grimberg, re 148 Notice of Appeal. Court Reporter: Alicia Bagley. Case Appealed to USCA 11th Circuit. Case Number 231370J . Financial Arrangements due 12/6/2023 (Hames, Adam) Modified on 11/22/2023 (adg). (Entered: 11/21/2023) |
| 11/22/2023 | | Set Appeal Deadlines as to Joshua Herrera re 154 Transcript Order Form : Financial Arrangements due on 12/6/2023 (adg) (Entered: 11/22/2023) |
| 12/06/2023 | 155 | Court Reporter Acknowledgment as to Joshua Herrera re: 154 Transcript Order Form, filed by Joshua Herrera. Case Appealed to USCA- 11th Circuit. Case Number 23-13706-J. Transcript is required. Court Reporter: Alicia B. Bagley. Satisfactory financial arrangements completed. Transcript due by 1/5/2024. (pjm) (Entered: 12/06/2023) |

| 12/06/2023 | 156 | TRANSCRIPT of Proceedings as to Joshua Herrera held on 10/26/23 (Sentencing), before Judge Steven D. Grimberg. Court Reporter/Transcriber Alicia B. Bagley. A full directory of court reporters and their contact information can be found at www.gand.uscourts.gov/directory-court-reporters. Fed.R.App.P. 11 Certification due on 12/20/2023. Redaction Request due 12/27/2023. Redacted Transcript Deadline set for 1/8/2024. Release of Transcript Restriction set for 3/5/2024. (Attachments: # 1 Notice of Filing Transcript) (pjm) (Entered: 12/06/2023) |
| --- | --- | --- |
| 12/06/2023 | 157 | Notification of Transcript Filed in District Court as to Joshua Herrera re: 154 Transcript Order Form, filed by Joshua Herrera. All transcripts for this request are now on file. (pjm) (Entered: 12/06/2023) |
| 12/06/2023 | | Pursuant to F.R.A.P.11(c), the Clerk certifies that the record is complete for purposes of this appeal, 148 Notice of Appeal as to Joshua Herrera. Case Appealed to USCA- 11th Circuit. Case Number 23-13706-JJ. The record on appeal is available electronically with the exception of: Exhibits Audio/Video (GOVT 12)(1 CD). (pjm) (Entered: 12/06/2023) |
| 02/01/2024 | 158 | Notice for Leave of Absence for the following date(s): March 4-8, 2024, July 22-26, 2024 and August 14-21, 2024, by Jesika W. French. (French, Jesika) (Entered: 02/01/2024) |

| PACER Service Center | | | |
| --- | --- | --- | --- |
| **Transaction Receipt** | | | |
| 02/12/2024 15:26:52 | | | |
| **PACER Login:** | Georgia_77 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:20-cr-00079-SDG-RDC |
| **Billable Pages:** | 16 | **Cost:** | 1.60 |

# DOC. # 10

# INDICTMENT

ORIGINAL

FILED IN OPEN COURT
U.S.D.C. - Atlanta

FEB 1 2 2020

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

JOSHUA HERRERA

Criminal Indictment

No.   1  2 0 - C R - 0 7 9

THE GRAND JURY CHARGES THAT:

## COUNT ONE

Beginning on or about November 21, 2019, and continuing until on or about January 16, 2020, in the Northern District of Georgia and elsewhere, the defendant, JOSHUA HERRERA, using a facility and means of interstate commerce, that is, a cellular telephone and computer connected to the Internet, did knowingly attempt to persuade, induce, entice, and coerce an individual who had not yet attained the age of 18 years to engage in sexual activity for which the defendant could be charged with a criminal offense, that is, child molestation (O.C.G.A. § 16-6-4), all in violation of Title 18, United States Code, Section 2422(b).

### Forfeiture

Upon conviction of Count One of this Indictment, the defendant, JOSHUA HERRERA, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 2428, any property, real or personal, used or intended to be used to commit or to facilitate the commission of such violation and any property, real or personal, that constitutes or is derived from proceeds

traceable to any such violation. The property to be forfeited includes, but is not limited to, the following:

> MONEY JUDGMENT: A sum of money in United States currency, representing the amount of proceeds obtained as a result of the offense alleged in Count One of this Indictment.

If any of the property described above, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

the United States of America, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), shall be entitled to forfeiture of any other property of said defendant up to the value of

the above forfeitable property.

A    _TRUE_    BILL

_____
FOREPERSON

BYUNG J. PAK
*United States Attorney*

RYAN K. BUCHANAN
*Assistant United States Attorney*
Georgia Bar No. 623388

600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181

3

# DOC. # 111

# ORDER OF THE DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

JOSHUA HERRERA

Criminal Action No.
1:20-cr-00079-SDG-RDC

**OPINION AND ORDER**

Before the Court are the Government's Supplemental Motion in Limine [ECF 102] and Renewed Motion [ECF 110] to exclude the testimony of Dr. Tyler Whitney related to autism spectrum disorder (ASD) and Defendant Joshua Herrera's ASD diagnosis. After careful review of the parties' arguments and relevant case law, the Court **DENIES IN PART AND GRANTS IN PART** the Government's Motions.

## I. Background

The United States charged Joshua Herrera with using a means of interstate commerce to knowingly attempt to persuade, induce, entice, and coerce a minor to engage in sexual activity in violation of 18 U.S.C. § 2422(b).[1] Herrera allegedly responded electronically to an advertisement on the social network Kik, posted by an undercover FBI agent purporting to be a mother looking for someone to teach

---

[1]    ECF 10.

her eleven-year-old daughter about sex.[2] Herrera communicated with the agent about the "daughter's" age and sexual experience and discussed plans to meet and engage in sexual acts with the "daughter."[3] Upon Herrera's arrival at the designated meet-up location, he was arrested by federal agents and taken into custody.[4]

While preparing for trial, Herrera's counsel learned from his mother that Herrera may suffer from ASD.[5] The Court continued the trial date to allow counsel to explore how Herrera's condition might affect his potential defense.[6] On December 30, 2022, Herrera's counsel sent the Government a report pertaining to a psychological evaluation of Herrera titled "Mental State at the Time of the Alleged Crimes" authored by Whitney, a licensed clinical psychologist.[7] Herrera plans to call Whitney to testify to the following:

- Herrera has ASD, including an explanation of the methodology used to reach this diagnosis.[8]

---

[2]  ECF 80, at 1.

[3]  *Id*. at 1–2.

[4]  *Id*. at 2.

[5]  ECF 90, at 1.

[6]  ECF 97.

[7]  ECF 102, at 1.

[8]  ECF 109, at 1.

- Herrera did not receive a formal ASD diagnosis as a child, including the reason for the delayed diagnosis.[9]

- Herrera exhibits certain traits that are common in individuals with ASD.[10]

- Herrera's behavior in this case *could* be consistent with the inability of many autistic persons to imagine how others might view certain behavior.[11]

- Herrera's behavior, though it may appear unusual to non-autistic persons, *could* be consistent with Herrera's statement that he was trying to save the "daughter."[12]

- Herrera's psychosexual assessment showed no indications that he has a sexual interest in children of either gender.[13]

The Government filed a motion *in limine* to exclude Whitney's testimony on the grounds that it violates the Insanity Defense Reform Act, Fed. R. Evid. 401, 402,

---

[9]    *Id.* Notwithstanding the discussion below, the Court tends to agree with the Government that Whitney's proffered testimony concerning the reason for Herrera's delayed diagnosis may be inadmissible on hearsay and other grounds. The Court reserves ruling on the admissibility of this specific area of inquiry until trial.

[10]    *Id.* at 2.

[11]    *Id.* at 2–3.

[12]    *Id.* at 3–4.

[13]    *Id.* at 4.

403, and 704(b), and renewed its motion following the pretrial conference in response to Herrera's written proffer of Whitney's testimony.[14]

## II.   Legal Standard

"A motion *in limine* is 'any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered.'" *Benjamin v. Experian Info. Sols., Inc.*, No. 1:20-CV-2466-RWS, 2022 WL 1697876, at *1 (N.D. Ga. Mar. 25, 2022) (quoting *Luce v. United States*, 469 U.S. 38, 40 n.2 (1984)). In fairness to the parties and their ability to put on their case, a court should exclude evidence *in limine* only when it is clearly inadmissible on all potential grounds. *Luce,* 469 U.S. at 41. The movant has the burden of demonstrating that the evidence is inadmissible on any relevant ground. *In re Seroquel Prod. Liab. Litig.*, No. 606MD-1769-ORL-22DAB, 2009 WL 260989, at *1 (M.D. Fla. Feb. 4, 2009). "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy, and potential prejudice may be resolved in proper context." *Id*. Denial of the motion means the court cannot determine whether the evidence in question should be excluded outside the trial context. *Id*. (internal citation omitted). It does not mean that all evidence

---

[14]   *See generally*, ECFs 102, 110.

contemplated by the motion necessarily will be admitted at trial. *Id*. At trial, the court may alter its ruling based on the proceedings or on its sound judicial discretion. *Id*.

## III.   Discussion

### A.   Whitney's testimony is admissible for the purpose of providing context for Herrera's actions and communications.

The Government moves to exclude expert testimony regarding Herrera's ASD diagnosis pursuant to FRE 402 and 403 to the extent Herrera plans to rely on it to negate his *mens rea*.[15] The Government argues that this testimony is only appropriately considered as part of an insanity defense, which Herrera is not pursuing, and therefore, it is not helpful to the trier of fact.[16] Moreover, because Herrera has not raised an insanity defense, the Government argues that Whitney's testimony should be excluded as irrelevant since "it is akin to justification or excuse and does not negate the *mens rea* of enticement."[17]

In response, Herrera makes clear that he does not intend to argue that he was incapable of forming the requisite specific intent. Rather, Whitney's testimony will provide the jury with an "understanding of [ ] Herrera's neurological

---

[15]   ECF 102, at 2.

[16]   ECF 110, at 1.

[17]   ECF 102, at 6.

deficits,"[18] which is relevant to the jury's determination of whether he formed the requisite intent to entice a child. In other words, Herrera plans to use evidence of his diagnosis to provide necessary context to attack the specific intent element of the charged offense, not to argue that he did not (or could not) have the capacity to form such intent.

Interpreting the body of relevant case law on this issue requires parsing concepts along numbingly nuanced lines. The Constitution "guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). Of course, that right is not absolute and must sometimes be abridged to ensure fairness and the reliability of evidence. "The right to introduce relevant evidence can be curtailed if there is a good reason for doing that." *Clark v. Arizona*, 548 U.S. 735, 770 (2006).

Lawmakers have found good reason for curtailing a defendant's right to offer psychiatric evidence in his defense. Congress enacted the Insanity Defense Reform Act (IDRA) in 1984, making it an affirmative defense to argue that, "at the time of the commission of the acts constituting the offense, the defendant, as a

---

18   ECF 104, at 2–3.

result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts." Evidence of a defendant's mental disease or defect cannot otherwise provide a defense. *Id*.

The Eleventh Circuit has interpreted the IDRA "to prohibit the presentation of evidence of mental disease or defect, short of insanity, to excuse conduct." *United States v. Westcott*, 83 F.3d 1354, 1358 (11th Cir. 1996). However, it has also held that "psychiatric evidence is still admissible where it negates the *mens rea* of a specific intent crime." *United States v. Bates*, 960 F.3d 1278, 1288 (11th Cir. 2020). Working within these bounds is challenging. Defendants must show how the psychiatric evidence they wish to offer "would negate intent and not merely present a dangerously confusing theory of defense more akin to justification and excuse than a 'legally acceptable theory of lack of *mens rea*.'" *United States v. Cameron*, 907 F.2d 1051, 1067 (11th Cir. 1990) (quoting *United States v. Pohlot*, 827 F.2d 889, 906 (3d Cir. 1987)).

In *Cameron*, the Eleventh Circuit delineated two types of psychiatric evidence: "affirmative defense psychiatric evidence" and "psychiatric evidence to negate specific intent," making clear that the two are distinct. "Affirmative defense" evidence of mental impairment must be raised by the defendant and can justify or excuse conduct that is otherwise criminal. 907 F.2d at 1067. Psychological

evidence aimed at negating a defendant's specific state of mind at the time he committed the alleged crime "by contrast, is not an affirmative defense but is evidence that goes specifically to whether the prosecution has carried its burden of proving each essential element of the crime—at least when specific intent is at issue." *Id*. at 1063. The latter, the Eleventh Circuit held, is not *per se* inadmissible.

An additional distinction is required. Where psychiatric evidence is admissible, evidence that a defendant lacks the *capacity* to form *mens rea* is to be distinguished from evidence that the defendant *actually* lacked *mens rea*. Though the two may be logically related, "only the latter is admissible to negate the *mens rea* element of an offense." *Westcott*, 83 F.3d at 1358. This distinction was fundamental to the court's holding in *United States v. Ngo*, No. CR H-17-413, 2020 WL 1234186, at *3 (S.D. Tex. Mar. 13, 2020). The defendant's expert in that case proffered that her training and experience would help the court in "determining the capacity of an individual to form [intentional] criminal responsibility and criminal culpability." *Id*. The expert then proffered that both autistic individuals and the defendant lacked *capacity* to understand the social environment around them or develop adequate social problem-solving skills. *Id*. The court excluded the expert's testimony because it could "only [serve to] confuse the jury as to whether

[the defendant] could ever form the intent required, not elucidate whether he had formed the *mens rea* during the period in the indictment." *Id.*

Expert testimony related to psychiatric evidence was also excluded in *United States v. Litzky*, 18 F.4th 1296, 1303 (11th Cir. 2021). There, the defendant was charged with various specific-intent child-pornography offenses. The defendant attempted to offer expert psychological testimony that her intellectual disability coupled with her history of victimization placed her in a position of extreme vulnerability. The Eleventh Circuit affirmed the trial court's order excluding this evidence because the defendant "failed to demonstrate how her psychiatric evidence would negate intent and not merely present a dangerously confusing theory of defense more akin to justification and excuse." *Id.* Because the evidence did not focus on the defendant's specific state of mind at the time of the charged offenses, it thus "fail[ed] to show how defendant was unable to form the required *mens rea.*" *Id.* The issue was not whether the defendant, as a general matter, had mental health issues or was vulnerable to manipulation, but whether she "knew what she was doing when she produced the pornographic images of her children." *Id.* at 1305. The proffered expert testimony regarding her psychiatric health ultimately did not bear on this question and thus, was irrelevant and inadmissible.

The proffered expert testimony in this case is different from the testimony in both *Ngo* and *Litzky*. Unlike the expert in *Ngo*, Whitney will not opine on Herrera's general capacity to *ever* develop the requisite intent. Whitney also will not testify to the general ability of an individual with ASD to *ever* develop the capacity to commit the charged offense. And, unlike in *Litzky*, the proffered testimony in this case is relevant to Herrera's formation of the necessary specific intent at the time of the charged conduct, not a general opinion about Herrera's mental health untethered to any element of the offense.

The Court concludes that allowing this evidence for the limited purpose of evaluating Herrera's *mens rea* to commit the charged offense does not impermissibly side-step the IDRA. While the line is fine, Whitney's testimony falls on the admissible side because it leaves the ultimate question of Herrera's actual intent within the purview of the jury. Whitney may contextualize Herrera's behaviors and provide insight into his mental state. But the jury will determine whether, in light of all the evidence, the government proved beyond a reasonable doubt that Herrera developed the specific intent required for conviction. Whitney's proffered testimony falls within the latter of the two categories

described in *Cameron*: "psychiatric evidence to negate specific intent." The Government's motion to exclude this evidence in advance of trial is denied.[19]

### B. Whitney's proffered testimony that Herrera's psychosexual assessment showed no indications that he has a sexual interest in children is excluded.

Herrera also plans to have Whitney testify to his finding that Herrera's psychosexual assessment showed no indications that he has a sexual interest in children. The Court concludes that under Eleventh Circuit precedent, this opinion qualifies as inadmissible ultimate opinion testimony under Fed. R. Evid. 704(b). Additionally, even if this testimony were admissible under Rule 704(b), its probative value is substantially outweighed by the danger of unfair prejudice and is excluded under Fed. R. Evid. 403.

Rule 704(b) prohibits experts in criminal cases from offering opinions about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged. "An expert may, consistent with Rule 704(b), give testimony 'that supports an obvious inference with respect to the defendant's state of mind if that testimony does not actually state an opinion on

---

[19]   The Court invites the Government to propose a limiting jury instruction concerning Whitney's testimony, to be delivered at the time of the testimony or as part of the final charge, or both.

[the] ultimate issue, and instead leaves this inference for the jury to draw.'" *United States v. Stahlman*, 934 F.3d 1199, 1220 (11th Cir. 2019) (quoting *United States v. Augustin*, 661 F.3d 1105, 1123 (11th Cir. 2011)).

The Eleventh Circuit opinion in *United States v. Gillis* is on point with the issue presented. There, like here, the defendant was charged with attempting to knowingly induce or entice a minor to engage in sexual activity, in violation of 18 U.S.C. § 2422(b). 938 F.3d 1181, 1195 (11th Cir. 2019). The district court excluded the expert's proffered opinion that the defendant was not sexually attracted to prepubescent girls. According to the district court, this opinion was nothing more than a "thinly veiled attempt" by the defense to offer an expert's opinion on the ultimate issue of intent. The Eleventh Circuit found no clear error in the district court's ruling, finding that allowing such testimony would have prevented the jury from drawing its own inference and "veered into the impermissible territory of offering an opinion on [the defendant's] mental state." *Id*.

While there is arguably conflicting case law,[20] the Court follows *Gillis* here. Herrera makes a strong argument that testimony regarding his lack of interest in

---

[20]   In *United States v. Hite*, 769 F.3d 1154, 1169 (D.C. Cir. 2014), the D.C. Circuit held that the issue of sexual attraction to children is generally relevant to the element of intent in enticement cases. In *United States v. Stahlman*, 934 F.3d 1199, 1220 (11th Cir. 2019), the same year it issued the *Gillis* opinion, the

children is not directly opining on his intent for the crime with which he is charged and, therefore, the jurors can still draw their own inference. Again, the line here is thin. But faced with this factually (nearly) identical precedent, the Court follows *Gillis* and excludes Whitney's testimony regarding Herrera's psychosexual analysis on the grounds that it offers an opinion on an ultimate issue.

The Government is on stronger ground with its Rule 403 argument. The fact that Herrera's assessment showed no indication of sexual attraction to children has very little probative value to the questions the jury must resolve. It provides no context for Herrera's specific intent in this case—his general inclinations and proclivities (or lack thereof) will not help a jury make a determination as to whether he had the requisite intent *here*. The potential prejudicial impact, on the other hand, is substantial and undue; it could confuse the issues and mislead the jury by causing it to conflate Herrera's general propensity to commit sexual crimes against children with his specific intent to commit the crime with which he is charged in this case. Accordingly, in addition to excluding Whitney's opinion

---

Eleventh Circuit credited the reasoning in *Hite,* noting that expert testimony that a defendant had not been diagnosed with any psychiatric condition associated with sexual attraction to children *did not* amount to an opinion on the defendant's intent nor violate 704(b). Under the facts presented here, Undersigned is unable to meaningfully square the dicta in *Stahlman* with the holding in *Gillis*.

regarding Herrera's psychosexual assessment under Rule 704(b), it is also excluded under Rule 403, as the potential prejudicial effect substantially outweighs any probative value. In fact, the Court concludes that Rules 403 alone is a sufficient and independent basis to exclude Whitney's proffered testimony in this regard.

## IV.   CONCLUSION

The Government's Supplemental and Renewed Motions in Limine to exclude Dr. Whitney's expert testimony [ECFs 102, 110] are **DENIED IN PART AND GRANTED IN PART**.

**SO ORDERED** this 20th day of March, 2023.

Steven D. Grimberg
United States District Court Judge

# DOC. # 109

## REPORT OF DR. TYLER WHITNEY

## FILED UNDER SEAL

# TYLER T. WHITNEY, PSY.D.

LICENSED CLINICAL PSYCHOLOGIST

Adjunct Assistant Professor, Psychiatry and Behavioral Sciences
Emory University School of Medicine

875 OLD ROSWELL ROAD, SUITE A-600
ROSWELL, GA 30076
TYLER@DRWHITNEY.ORG

Caitlyn Wade, Esq.
Michael Hutcheson, Esq.
Sean Young, Esq.
Federal Defender Program-Atlanta
District of Northern Georgia
Centennial Tower, Suite 1500
101 Marietta Street
Atlanta, Georgia, 30303

## MENTAL STATE AT THE TIME OF THE ALLEGED CRIMES

**RE:**                    Joshua Ruben Herrera

**INFORMATION SOURCES**

4

5

6

|  |  |  |  |  |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

| | | | | |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

The conclusions and opinions expressed in this report are based upon the identified sources of information. Additional information may exist that could alter these conclusions and opinion. I remain available to examine any other information if needed.

Tyler T. Whitney, Psy.D.
Adjunct Assistant Professor, Department of Psychiatry
and Behavioral Sciences
Emory University School of Medicine
Psychiatry & Law Service
Incoming Co-Chair 2023 Atlanta Autism Consortium (AAC) Board of Directors

Enc: *Curriculum Vitae*

# DOC. # 141

# P. 8-12

## RELATED RULING OF THE DISTRICT COURT

1          Nevertheless, it does seem that the late disclosure was

2     fairly insignificant.  It was, I think, in the morning after the

3     deadline and given that -- I presume I haven't seen this material.  I

4     presume this material is the underlying data and information that is

5     comprised of the report itself which was produced back in December.

6     Hopefully, the government has had a chance to review that material by

7     now and you can tell me if that's not the case.  But given that, I'm

8     not sure what the prejudice is.  It does seem to fall more broadly in

9     the category of *Jencks*' material than anything else and you have it in

10    advance of when *Jencks*' disclosure would need to be made.  For those

11    reasons, I denied that aspect of the motion.

12          With respect to the request to *voir dire* Mr. Whitney in

13    advance, I just don't see that as necessary given the explicit

14    parameters that I set in the order denying the motion.  I think what

15    is allowable and what is not is pretty explicit, pretty specific, and

16    I presume Ms. Wade and Mr. Young have given their witness those

17    instructions.

18          To the extent that, obviously, we'll all be listening

19    carefully during his testimony in realtime and if there's an

20    objection, please lodge it immediately and we'll deal with it then

21    and, if necessary, I'll give the jury an instruction to disregard the

22    question or the answer, as necessary, and we can presume the jury will

23    follow those instructions, as we always do, whenever there's an

24    objection that's sustained.  So I don't see the need to go through

25    that process of *voir dire*ing the witness in advance given that the

1  order fairly specifically delineates what is proper expert testimony

2  and what is not, in my view, so those are the reasons for the denial.

3       Any questions about that?  Anything you wish to discuss

4  further?

5       MS. FRENCH:  I just want to make a clarifying point for

6  the record, if I can, Your Honor.

7       THE COURT:  Sure.

8       MS. FRENCH:  What we received was 106 pages of scanned

9  PDFs.  Many of those pages did not include data with blank pages of a

10  test with no data on the actual test.  It also did not include all the

11  data for every test that was provided in the report, including there

12  was one test that is the only test that Dr. Whitney performed that has

13  a validity scale - meaning there's a way to tell if someone is

14  cheating the test - that data was not provided at all to us so there

15  were issues with the data.  I wanted to get the issue in front of the

16  Court as soon as possible.

17       But nevertheless, we want to make sure that it's clear on the

18  record.  The Court's position is that it's *Jencks*' material -- the

19  underlying data would be considered *Jencks*' material because I know

20  our offices are in discussion with what Rule 16 and what has to be

21  disclosed under the new rule moving forward.  I want to make sure that

22  we are receiving it as well because, you know, the government has

23  things we have to disclose as well and we want to make sure that we're

24  following the rules going forward so the government is prepared.  I'm

25  not whining or complaining, we can go forward today.  I do want to be

1  clear that what we received was incomplete and did not include

2  everything that Dr. Whitney did in the testing of Mr. Herrera.

3          THE COURT:  I haven't thought about how the new rule and

4  the disclosure obligations under the new rule impact today because

5  we're not operating under that new rule.

6          MS. FRENCH:  Right.

7          THE COURT:  My understanding and impression is that this

8  is the data that was used by Mr. Whitney to prepare his report and the

9  report is a summary of his opinions and conclusions and findings and

10  so, to the extent that's true, then, yes, that material, in my view,

11  would be *Jencks*' because that's the purpose of the report is to

12  synthesize his findings and conclusions in one comprehensive piece

13  which is, actually, more helpful to the government to have a report

14  than just sort of dumping the data and having you figure out what his

15  opinions are going to be.  So, yes, in this case under our current

16  rules, in my view, this material is *Jencks*' - and I'm saying that

17  without having seen the material myself so you would need to tell me

18  if that's not the case.  But it seemed to me based on the description

19  of counsel that it constituted *Jencks*' material.

20          Now, to the extent that there's, you said, blank pages and

21  things, have you conferred with Ms. Wade or Mr. Young about that?

22          MS. FRENCH:  I received the Court's order and so I

23  assumed we were proceeding going forward.  But if we are thinking that

24  it's *Jencks*' material, I would ask that -- and I can talk with Ms.

25  Wade offline about what we didn't receive and the fact that we

1    received that before he testifies.

2            THE COURT:  Yes.  I mean, certainly in the interest of

3    saving time - and I think we're all interested in doing that and

4    certainly, you know, we have some scheduling limitations where we're

5    trying to get done with the trial this week - it certainly would save

6    time to produce that material in advance and counsel have attempted to

7    do so.  If there were some error in the production in terms of pages

8    being inadvertently blank, I would hope that counsel can work that

9    out.

10            MS. FRENCH:  We'll discuss that offline, Your Honor.

11    Thank you very much.

12            THE COURT:  All right.  While we're on the topic of Mr.

13    Whitney, the government proposed a limiting instruction, which is ECF

14    119.  Now, Ms. French, was it your proposal that this be read during

15    his testimony or as part of the closing instructions?

16            MS. FRENCH:  My proposal was before he testifies and

17    then during the closing instructions.

18            THE COURT:  All right.  So before he even begins?

19            MS. FRENCH:  Yes.

20            THE COURT:  All right.  Any objections to the

21    instruction?

22            MS. WADE:  Judge, I was not expecting us to address this

23    so early.  I don't expect that he would -- that there's any way we

24    would reach his testimony today so if myself and Mr. Young can confer

25    about it.  I don't think, generally, it would be appropriate to have a

1    limiting instruction before he testifies.  I think that his testimony
2    itself will not be able to get into the topics that the government is
3    asking the limiting instruction to cover so I would think his
4    testimony itself -- if he doesn't testify about the topics that
5    they're concerned about, then there's no need to limit his testimony
6    and the jury can assess the testimony on their own.  I think that that
7    somehow signals to the jury that this testimony is different and that
8    is just not the case so I would generally say we object to it.  But as
9    to a more specific discussion, if the Court would address that at
10   another time, we'd appreciate it.

11           THE COURT:  All right.  Well, I mean, his testimony is
12   different.  Expert testimony is different than other testimony and the
13   pattern instructions even acknowledge that and point that out to
14   jurors so I disagree with that.  I am going to allow a limiting
15   instruction so, in principle, that request has been granted.  I will
16   give you time to review the instruction that's been proposed and let
17   me know if you have any proposed modifications to it.

18           MS. WADE:  Thank you, Judge.

19           THE COURT:  Then just a reminder about the timing, the
20   time we have for your questioning of the witnesses.  After I finish
21   with the qualification questions and conflict-related questions, I'll
22   turn it over to you all.  Each side has a total of 45 minutes per
23   panel.  So for the first 14 you have 45 minutes in total, but we're
24   going to break that up into a segment of 30 and a segment of 15.  So
25   the government will go for 30 and then defense will go for 30 and the

# DOC. # 142

# P. 395-403

# INITIAL TESTIMONY OF SA MEGAN PERRY

```
 1                          (witness steps down)
 2              THE COURT:  Call your next witness.
 3              MS. FRENCH:  Yes, Your Honor.  The government calls
 4   Special Agent Megan Perry to the stand.
 5                          (witness was sworn)
 6              THE CLERK:  Thank you, ma'am.  You can take your seat
 7   and if you would, please, state your name for the record and spell
 8   your last name.
 9              THE WITNESS:  Megan Perry.  P-E-R-R-Y.
10              THE CLERK:  Thank you, ma'am.
11                         DIRECT EXAMINATION
12   BY MS. FRENCH:
13   Q.   Good afternoon, Agent Perry.
14   A.    Good afternoon.  Good afternoon.
15   Q.   Can you please introduce yourself to the jury.
16   A.    Yes.  I am Megan Perry.  I'm a special agent with the Federal
17   Bureau of Investigation.
18   Q.   And how long have you been a special agent with the Federal
19   Bureau of Investigation?
20   A.    Since August of 2014 so about eight and a half years.
21   Q.   And how long have you been assigned to your current role with
22   the -- excuse me, with the Crimes Against Children unit?
23   A.    I have worked Crimes Against Children for just a little over six
24   years.
25   Q.   And did you work with any other units before you came to the
```

1    Crimes Against Children unit?

2    A.    I did.  I worked healthcare fraud as well.

3    Q.    What kinds of cases are investigated by the Crimes Against

4    Children unit?

5    A.    We deal with cases involving the sexual exploitation of children

6    so child pornography cases such as possession, distribution,

7    production of child pornography.  We do enticement of minor cases,

8    travel with the intent to engage in sex with minors.  We work sex

9    trafficking, sometimes labor trafficking, if it involves a minor, and

10    we also investigate kidnappings of minors.

11    Q.    Do you have to undergo any kind of special training to become

12    part of your squad?

13    A.    Not necessarily to become part of our squad.  But all agents go

14    through the standard training in Quantico which it varies when they

15    change it, but it ranges anywhere from 18 to 21, 22 weeks of training.

16    Q.    And do you also handle undercover investigations?

17    A.    I do.

18    Q.    And do you undergo any special training specifically for

19    undercover investigations?

20    A.    Yes.  You have to be certified to conduct undercover

21    investigations and it's a week-long training.

22    Q.    And is one of your undercover investigation posting

23    advertisements in on internet like what we've seen in this case?

24    A.    Yes.

25    Q.    And why do you do undercover investigations?

A.    We do proactive undercover work as a means to try to identify

individuals who have a sexual interest in children before they have

the opportunity to come in contact with an actual child.

Q.    Can you describe generally how these investigations work.

A.    Yes.  So if I'm doing an undercover investigation -- we go to

sites, websites or applications, that we call predicated.  So that

just means a site that's known to law enforcement to be used as a

means to facilitate the sexual exploitation of children.  So we might

post an advertisement or a statement on those sites with some

information to see -- saying "Respond to this posting if you're

interested," and then if you get responses then you'd communicate back

and forth.

Q.    Approximately how many investigations of that type have you been

involved in?

A.    Oh, boy.  Probably, I'd say, 50 or more.

Q.    And are you the lead case agent for this case, the United States

against Joshua Herrera?

A.    I am.

Q.    So I'd like to talk now specifically about that investigation.

What was your role -- or let me ask a different question.  Where did

you start in this investigation?

A.    I actually posted the advertisement on Fetlife.com which you

heard of earlier.

Q.    What day did you do that?

A.    It was November 19th of 2019.

1    Q.    Potentially -- if I showed you the ad, does it have a date on it?

2    A.    It does not.

3    Q.    Okay.  Where did you post the ad?

4    A.    I posted it, like I said, on Fetlife.com.  I actually posted two

5    ads on the same day in two different sections of the website.  One was

6    Atlanta Hookups, it was called, and one was Personals.

7    Q.    Okay.  I'm going to -- showing opposing counsel what's previously

8    been provided as Exhibit 10.  I'm now going to hand you Exhibit 10.

9    Can you identify it for me.

10   A.    Yes.  These are screen shots that I took after I had posted

11   those particular ads.

12   Q.    And is that a fair and accurate copy of the screen shots you took

13   of the activity you posted?

14   A.    Yes.

15   Q.    And is the second page a fair and accurate copy of your profile

16   page?

17   A.    That's correct.

18              MS. FRENCH:  Okay.  At this time, Your Honor, we move to

19   enter Government's Exhibit 10 into evidence.

20              THE COURT:  Any objection?

21              MS. WADE:  Give me one second.  Can you give me one

22   second to communicate?

23              MS. FRENCH:  May I make one adjustment to the exhibit,

24   Your Honor, and I think we'll have an agreement.  Just for the record,

25   I've taken Page 2 of the profile out of Exhibit 10 and at this time we

1    would move to enter Exhibit Number 10, just the single page, into

2    evidence.

3                    MS. WADE:  With that modification, we have no objection.

4                    THE COURT:  All right.  It's admitted.

5                    MS. FRENCH:  Okay.  Permission to publish to the jury,

6    Your Honor.

7                    THE COURT:  Yes.

8                    MS. FRENCH:  So if we could please pull up Exhibit

9    Number 10.  Is it possible for us to zoom in on the bottom?  The

10   bottom posting.

11   BY MS. FRENCH:

12   Q.   Special Agent Perry, we're seeing two postings on the screen

13   right now.  Can you explain to me why there are two postings.

14   A.   I just posted in two different sections of the website just to

15   broaden the scope when people are looking on the website in those

16   different areas.

17   Q.   And do you use an undercover identification as a screen name in

18   this operation?

19   A.   Yes.  My username, I believe you can see it right under the --

20   it's kind of the middle of the page from each post.  It's Daughter

21   Lover_11.

22   Q.   I think you might be able to see it better on the screen.  Can

23   you see it on the screen?

24   A.   Yes.

25   Q.   And what was your profile picture?

1   A.    It is a picture of little girl's underwear.  You can kind of --
2   it's not the entirety of the pair of underwear, but you can tell the
3   pink stripe of the band at the top and it has Elsa printed on it.
4   Elsa, I'm sure everybody is aware, is from the Disney movie Frozen.
5   Q.    Did you write everything on this advertisement yourself?
6   A.    I wrote the title.  So on the one you're looking at - "No limits
7   fun," and then I wrote the text starting with "Mom" all the way
8   through the period.
9   Q.    So I'd like to talk through this.  Why did you use the term "no
10  limits fun"?
11  A.    "No limits" is a common terminology used in these types of
12  investigations for individuals who have a sexual interest in children.
13  "No limits" indicating like no age limits or no limits to what you're
14  looking for.
15  Q.    And what do you mean by "like-minded"?
16  A.    So "like-minded," as it kind of sounds, individuals with similar
17  interests and so that, used in context with the other terminology,
18  that's commonly used in these investigations.  So it's saying looking
19  for someone with similar interests who has no limits.
20  Q.    And when you say "no limits perv," is that a similar reason why
21  you use that terminology?
22  A.    That's correct.
23  Q.    Why not just come out and say, you know, anyone want to have sex
24  with an 11-year old?
25  A.    Right.  So there's -- mainly because a lot of these sites do

1    monitor what's posted and so if I was very explicit in the post it

2    would just be removed.  And also because if we use terminology that

3    really people who have this interest and know what the terminology is

4    and used in the ad then it's generally a good way to know the people

5    who are communicating with you understand what you're saying.  Not

6    everybody does but it's another tool to get to the people that you're

7    interested in looking for.

8    Q.   You say "Hit me up on Kik" at the end of your posting.  What is

9    Kik?

10   A.   Kik is a mobile messaging application so it can be downloaded

11   like on a phone or a tablet.  It functions kind of like -- I think

12   WhatsApp was brought up earlier, it functions like that.  So you can

13   send text messages back and forth either one-on-one or in a group

14   setting.  You can also exchange videos and images, either saved ones

15   from your camera role, or you can take live pics and send them back

16   and forth, as well.

17   Q.   Just to be clear.  Kik is a separate application you download on

18   your phone?

19   A.   Correct.

20   Q.   So it's not the text messages through your phone?

21   A.   That's correct.

22   Q.   Okay.  Do your posts like this ever get flagged by Fetlife.com?

23   A.   Yes, they can.

24   Q.   Okay.  And when I say "flagged," is there a method for flagging

25   posts on Fetlife.com?

1   A.   Yeah.  So Fetlife sometimes might flag them like if they see a

2   post that they deem necessary to flag.  You can also report other

3   people's posts.

4   Q.   And to back up for a minute.  What is Fetlife.com?

5   A.   Fetlife.com is like a social-networking-type website that's used

6   for people who have interests in different kinks and fetishes so it's

7   a site where you can go and find information or other people who have

8   similar interests.

9   Q.   Have you ever had any of your postings flagged on Fetlife before?

10  A.   I believe I have once, if I recall, but I can't say for certain.

11  They get flagged a lot.  I don't know specifics.  I don't recall

12  specifically if it was Fetlife or maybe another site I posted on.

13             MS. FRENCH:  Thank you.  So we can go ahead and take

14   that down.  Thank you.

15  BY MS. FRENCH:

16  Q.   Do you get responses on Kik from this kind of posting?

17  A.   Yes.

18  Q.   And is there -- how many, a normal number, that you would get on

19  average for a posting like this?

20  A.   I would say generally a minimum of 15.  It's been as high as

21  probably in the over 50.

22  Q.   Is there a process for funneling down who you investigate out of

23  those responses?

24  A.   Yes.  Generally start with just trying to find out what their

25  interests are, if it seems like they have the same interests so

1  narrowing down what their interests are to see if it's someone who

2  truly has a sexual interest in children or maybe someone who didn't

3  understand what the post meant and they were just looking to talk to

4  someone about something else.

5  Q.    Did you have a response from someone named Josh C on Kik?

6  A.    Yes.

7  Q.    Okay.  I am now showing defense counsel what has previously been

8  marked as Exhibit 1.  I'm now going to show you Exhibit 11.  Can you

9  identify it for me, please.

10  A.    Yes.  These are screen shots of Kik conversations between myself

11  and Josh C or Mr. Herrera.

12  Q.    And you said they're screen shots of the conversation.  How did

13  you make these screen shots?

14  A.    First I made a video screen recording so on my -- the device I

15  was using, which was a cellphone, I screen recorded like a video of

16  all the messages as we went through and then from that video I then

17  went and captured screen shots and so we had a video and an image of

18  the same thing.

19  Q.    And have you had a chance to review all of the pages of

20  Exhibit 11 before today?

21  A.    Yes.

22  Q.    Okay.  Are they a fair and accurate copy of the messages sent

23  during the course of your investigation?

24  A.    Yes.

25              MS. FRENCH:  At this time we move Exhibit Number 11 into

# DOC. # 143

# P. 504-542

## TESTIMONY OF DR. TYLER WHITNEY

1    defendant is not required to put on any case at all.  But they have

2    chosen to do so and I understand they're prepared to call their first

3    witness.

4                 MR. YOUNG:  Defense would like to call Dr. Tyler Whitney

5    to the stand.

6                 THE COURT:  Come on up, sir.

7                 THE CLERK:  Good morning, sir.  If you would raise your

8    right hand, please, to be sworn.  Thank you.

9                          (witness was sworn)

10                THE CLERK:  Thank you, sir.  You can take your seat and

11   if you would, please, sir, state your full name for the record and

12   spell your last name.

13                THE WITNESS:  Sure.  Tyler Tippets Whitney.  Last name

14   W-H-I-T-N-E-Y.

15                THE CLERK:  Thank you, sir.

16                          <u>DIRECT EXAMINATION</u>

17   BY MR. YOUNG:

18   Q.   Good morning, Dr. Whitney.  What we're going to start off first

19   is just talk about your background qualifications.  What is your name?

20   A.   Tyler Tippets Whitney.

21   Q.   And what's your occupation?

22   A.   I'm a licensed clinical psychologist.

23   Q.   Can you tell us a little bit about your educational background.

24   A.   Sure.  I received a bachelor's degree in psychology from

25   Westminster College in Salt Lake City, Utah.

1         I received a doctorate in clinical psychology from the Forest

2 Institute of Professional Psychology in Springfield, Missouri.

3         I did an internship, which is a first year of clinical

4 training, at St. Charles Hospital and Rehabilitation Center.  It's a

5 rehabilitation hospital in Long Island, New York affiliated with State

6 University New York Stony Brook.

7         I then went on and did a postdoctoral fellowship at the

8 Connection Center in Houston, Texas under the guidance of Dr. Steven

9 Gutstein who is the person that created a program called Relationship

10 Development Intervention or RDI.

11         I went on after that and did fellowship training with Mack

12 Stevenson and Robert Calhoun in private practice in Boise, Idaho.

13         And, finally, during my practice I was chosen to be part of

14 what's called the LEND program and this specific program in the state

15 of Idaho is under what's called the UR LEND program, Utah Regional

16 LEND program, and it is a two-year program with the first year being

17 general neurodevelopmental training as to the state of disabilities in

18 the United States, the history and those types of things.  The second

19 year is what's called an Autism Enhancement which means you do

20 training in specifically autism and how, both regionally and

21 nationally, autism is being treated and handled, so on and so forth.

22         Then I was in private practice in Boise, Idaho from 2005

23 until 2012 at which point I relocated to Atlanta, Georgia, in May of

24 2012.  And from May of 2012 until presently I've had private practice.

25 I affiliated myself with Emory University School of Medicine,

1    specifically the psychiatry and the law service which deals with, in
2    my case, disabilities as they relate to legal situations and they're
3    under the direction of Peter Ash who's the director of the service.
4    We train postdoctoral psychology residents and postdoctoral psychiatry
5    fellows that are training forensically to be involved in legal issues
6    related to the courts and I've been doing that as a participant at
7    first when I arrived and then I was given adjunct faculty status in
8    2015.
9    Q.    When you say "adjunct faculty status" to teach what course?
10   A.    What they have me do is they have me lecture when they bring in
11   the pediatric psychiatry residents, specifically from January
12   typically through the start of summer, which is June, and talk about
13   things that relate to individuals that would be under the age of 18
14   such as special education law, juvenile courts, the difference between
15   a minor being tried as an adult or being tried as a minor, anything
16   that would relate to the juvenile population and forensics.
17   Q.    And just briefly -- let me rewind for a sec.  When you mentioned
18   that post doc, what was that about?
19   A.    The LEND post doc?
20   Q.    Before the LEND -- before the fellowship.
21   A.    Those were general fellowships that are not required in
22   psychology, but I chose to do them simply to learn private practice.
23   Q.    And, sorry, I know the context may be really obvious, but private
24   practice in what?
25   A.    Private practice in clinical psychology.

1  Q.    And what was the area of study in the LEND program in Idaho?

2  A.    It is the history and production and state of neurodevelopmental

3  disabilities which would include autism, but would also include

4  genetic disorders, any disorder that would be related to atypical

5  development in childhood.

6  Q.    What are your current licenses and certifications, if you haven't

7  already covered?

8  A.    My licenses -- I'm licensed in the state of Georgia.  I'm

9  licensed in the state of Utah.  I'm licensed in the state of Arizona.

10 I was, when I initially started, licensed in the state of Idaho, but I

11 am no longer licensed in the state of Idaho.

12 Q.    And again, just to be clear, licensed in what?

13 A.    Licensed as a clinical psychologist.  Georgia and Arizona have

14 specific designation for clinical psychology.  Idaho and Utah, you're

15 licensed as a psychologist, it's not a clinical designation.

16 Q.    What is the significance of this clinical designation?

17 A.    It means that you see people in a clinical respect or that have

18 what they would consider difficulties or hardships in their day-to-day

19 living related to something that may be psychological or psychiatric.

20 Q.    Have you had any prior suspensions of your license?

21 A.    I have.  I had a suspension in the state of Georgia for 90 days

22 and that was related to the fact that I had three licenses.

23         I was under investigation in the state of Idaho for billing

24 discrepancies that was brought on by a disgruntled parent of a young

25 adult with autism who had a degree in public health and he was unhappy

1    that I sent his account -- or his son's account, which he was the

2    guarantor for, to collections at which point he filed a complaint with

3    the Idaho State Board for billing irregularities.  He also filed a

4    complaint with the Idaho Insurance Commission which triggered an

5    internal Blue Cross/Blue Shield audit for which I resolved by taking

6    care of the discrepancies in my billing, repaying any monies that were

7    used in federal programming, and entering into an agreement with them

8    to do things in a certain manner following that.

9    Q.    In that disciplinary process in Idaho, were there allegations

10   addressed by the board against the quality of your practice?

11   A.    No.  It was simply administrative and relating to billing

12   irregularities and administrative things.

13   Q.    You had mentioned that your license was suspended for 90 days in

14   Georgia.

15   A.    Correct.

16   Q.    What was that about?

17   A.    When I reapplied for licensure you're required to, in the state

18   of Georgia, reapply every two years.  I stated that there hadn't been

19   action against my license and I errantly, or ignorantly, did not

20   understand that surrendering my license to which I had the terminology

21   in the final order read "voluntarily surrender" was action against my

22   license because I was given advice by an attorney there --

23              MS. FRENCH:  Objection, Your Honor; hearsay.

24              THE COURT:  Overruled.

25              MR. YOUNG:  Your Honor --

```
 1              THE COURT:  I overruled it.
 2   BY MR. YOUNG:
 3   Q.    Go ahead.  You may answer the question.  You may continue.
 4   A.    I was given legal advice that it would be too costly and too
 5   expensive if I didn't entertain the idea of returning to Idaho to
 6   practice and that I simply could let my license lapse and enter into
 7   this agreement which would allow me to then re-apply for privileges
 8   after three years, if I chose to.
 9   Q.    Just so I understand.  I think you said when you came to Georgia
10   you indicated to them that you did not have any prior disciplinary
11   actions; is that correct?
12   A.    That is correct, on my 2014 licensure.  And that was the reason
13   why they took action against my license because that was not true and
14   that was ignorance on my part.  They also asked that I pay a $500 fine
15   and that I undertake an ethics course that they approved as well as
16   be -- not supervised, but on probation for a year following.
17   Q.    And did the Georgia license suspension ruling, to your knowledge,
18   suggest that you had been deficient in the quality of your practice
19   and how you treated patients?
20   A.    It did not.
21   Q.    Let's talk a little bit about your training and experience.
22   About how many years of supervised clinical experience did you have
23   where you were under the supervision of someone else?  Estimate.
24   A.    I would say four years.
25   Q.    And about how many years of independent clinical experience have
```

1   you had?

2   A.    From 2005 to present.  So I would say roughly just shy of

3   20 years.

4   Q.    And I apologize.  Every time I say "clinical experience," I'm

5   referring to clinical psychology.

6   A.    Correct.

7   Q.    How much clinical research experience have you had?

8   A.    I've done research for the Department of Defense.  I've done

9   research in relation to autism with Dr. Gutstein.  I've also published

10  in relation to my own practice in Idaho.

11  Q.    And how much teaching experience have you had?

12  A.    I was a graduate assistant at Forest Institute which means I

13  assisted the professors there.  During my graduate schooling, I taught

14  as an adjunct professor.  I taught statistics at the University of

15  Idaho remotely in their Boise campus and then the experience that I

16  have with Emory as well.

17  Q.    You don't need to list every single one of your publications, but

18  can you describe very briefly how much you have published and on what

19  topics.

20  A.    The three main publications that I think would be relevant to

21  this is -- I wrote a paper with Dr. Gutstein that I was the second

22  author for called "Asperger's Syndrome and the Development of Social

23  Competence" in 2001.  I wrote for the *Journal of Therapeutic Schools*

24  *and Programs* a 100-patient review of people with autism spectrum

25  disorders and various comorbid psychiatric disorders in 2008.  I am in

1    the process of publishing -- or there's a paper that is in review

2    related to autism spectrum disorders and the legal system.

3    Q.   Have you won any honors or awards related to your practice?

4    A.   Not related to my practice, no.

5    Q.   Are you a member of any organizations or consortiums?

6    A.   I am.  I'm the cochair of the Atlanta Autism Consortium, which

7    is the largest nonprofit in the state of Georgia, helping to integrate

8    and educate the community of the metro Atlanta area.  I would say even

9    broader than that as well, but certainly the metro Atlanta area.

10   Q.   If it's not possible to estimate this, that's okay.  About how

11   many people would you say you've evaluated psychologically over the

12   course of your career?

13   A.   I would say it would be in the thousands.  Not 10,000.  But

14   between 1,000 and 10,000, somewhere in there.

15              MR. YOUNG:  Your Honor, we would like to tender

16   Dr. Whitney as an expert in the area of autism spectrum disorder.

17   Give me a second, Your Honor.  If I may ask some followup questions.

18              THE COURT:  Sure.

19              MR. YOUNG:  First, actually give me a second.  Got it.

20   Sorry, Your Honor.  Let me revise that.  I would like to tender

21   Dr. Whitney as an expert in the area of clinical psychology with a

22   specialty in autism spectrum disorder.

23              THE COURT:  Any objection?

24              MS. FRENCH:  With that clarification, no, Your Honor.

25              THE COURT:  All right.  It's allowed and Dr. Whitney is

1   accepted as an expert in those areas.

2           Ladies and gentlemen, at this time I'm going to give you

3   another limiting instruction concerning Dr. Whitney's testimony.  I

4   will allow his testimony for the limited purpose of contextualizing

5   the defendant Joshua Herrera's behaviors and to provide insight into

6   his mental state.  You should not use the testimony of Dr. Whitney as

7   a form of justification or excuse for Mr. Herrera's alleged actions in

8   this case.  Dr. Whitney's testimony is not being offered for the

9   ultimate question of Mr. Herrera's actual intent.  You and you alone

10  as the jury will decide whether, in light of all the evidence, the

11  government proved, beyond a reasonable doubt, that Mr. Herrera

12  developed the specific intent required for conviction.

13          You may proceed.

14  BY MR. YOUNG:

15  Q.   Dr. Whitney, can you give the jury a general introduction to

16  autism spectrum disorder which I may just refer to as "autism" for

17  simplicity.

18  A.   Okay.  Certainly.  An autism spectrum disorder is a disorder

19  that starts virtually from the first day of life.  It actually starts

20  before that.  It has a genetic component.  But when you think about an

21  autism spectrum disorder I think, for purposes of this case and

22  purposes of the way that it's diagnosed, you need to recognize that

23  it's a disorder that's diagnosed in relation to the behavior of the

24  individual.

25          Okay.  So when I think about autism spectrum disorders, the

1    first thing I think about is the fact that when a person is born they

2    are naturally drawn to seek out other human beings, human voices,

3    those types of things, and to explore connection with other human

4    beings.  When you think about a person that has an autism spectrum

5    disorder, whether it's known or not from the time that they're born

6    the way that they interact with their environment, it's different,

7    okay.

8              So one of the things that we know from the science of autism

9    is that individuals with autism spectrum disorders, they pay attention

10   to or they track things differently.  So, for instance, we know from a

11   group of studies that was done in the early 2000's by a gentleman who

12   is the clinical Director of the Marcus Autism Center, Dr. Ami Klin,

13   and his colleagues, Warren Jones, when they were at Yale Child Study

14   Center they created mechanisms by which to measure what very, very

15   young individuals with autism spectrum disorders were looking at or

16   were paying attention to.  These are referred to, generally in the

17   field of autism research, as eye-tracking studies.

18             So they created a mechanism by which they could track what

19   individuals suspected of having autism - very young individuals under

20   three years of age - were looking at.  And so with this mechanism what

21   they were able to establish was where individuals that are born and

22   are typically developing are seeking out other human beings and, in

23   essence, trying to interact with other human beings in order to

24   understand their environment.

25             Individuals with autism spectrum disorders, although they

1    naturally have a tendency to be aware of other human beings, it isn't

2    necessarily grounded in the idea that they need the other human being

3    to explore their environment; hence, they oftentimes find other human

4    beings confusing.  A term that's used, quite honest, is fluid in the

5    fact that they don't act the same way towards the environment and

6    towards the individual with autism and so there's not any type of rule

7    or any type of consistency because their dynamic and ever changing

8    both with the environment and with the individual with autism.

9         Now, human children, they will do things to explore their

10   environment and the objects in their environment by checking in with

11   other human beings in their environment, something called joint

12   attention.  "Joint attention" is when an individual looks at an

13   object, then looks at a person, catches their gaze, and then both of

14   the individuals look back at the object.  So the individual is looking

15   both at the object and at the feeling or personality that the other

16   individual in the environment is having at looking at the same object.

17   Are they happy with the object?  Is the object threatening?  Any of

18   those kind of things.  So they're getting input not only from looking

19   at the object and exploring the object themselves, but also from the

20   other individual that's looking at the object with them.

21        There was a famous study done in psychology called the

22   Visual Cliff where nine-month-old children that could crawl were in a

23   room with their parents or caregiver and an evaluator and the floor

24   was or appeared to be parqueted or checkered, but then it appeared to

25   drop off.  It appeared that there was an edge.  It wasn't necessarily

1    an edge.  It was like a Plexiglass clear type of thing.

2         So typically developing children at nine months would crawl

3    towards this Visual Cliff, as you would have it, and then when they'd

4    get close to it they'd look back at the caregiver to see if the

5    caregiver was worried, concerned, those kind of things, to know

6    whether or not they could go forward or should go forward, whether it

7    was safe.

8         So what I'm talking about is the divergence in an infant or a

9    very young child and the way they explore their environment starts

10   before they can even speak, certainly before three years of age where

11   they're, in essence, exploring their environment on their own and

12   independent of any other input from any other people or human beings

13   or those kinds of things comparatively to an individual that would be

14   typically developing at that young age who would be checking in with

15   the other human being in the environment trying to get information not

16   only of their own but also the other individual's thoughts about the

17   object or the environment and what they were looking at and those kind

18   of things.

19   Q.   Dr. Whitney, I'm so sorry to cut you off rudely.  We can tell

20   you're a professor.  But let me just -- I'm going to move on a little

21   bit from there.  To the extent that early childhood development

22   becomes relevant to the answers to later questions, feel free to get

23   into them, but I'm going to ask you the next question.  I'm sorry to

24   rudely cut you off.

25   A.   Sure.

1   Q.   Can you review with the jury some of these childhood things which

2   you only got into a little bit how -- what are the diagnostic criteria

3   for autism spectrum disorder?

4   A.   So since the DSM-V TR, which is --

5   Q.   What is the DSM-V?

6   A.   The DSM is Diagnostic and Statistical Manual.  We're in the

7   Fifth Edition.  And the Text Revision makes sure that the authors of

8   this particular manual that both psychiatry and psychology use for

9   diagnosis is the best criteria for any given mental-health disorder or

10  mental disorder.

11  Q.   And what does the DSM-V say are the criteria for diagnosing

12  autism?

13  A.   The diagnostic criteria, according to DSM-V TR, would be social

14  communicative delays or deficits in the way in which the person

15  interacted with other people in their environment and then, secondly,

16  restrictive and repetitive patterns or behaviors and four of those are

17  given examples.

18       So one example would be an intense area or a hyperfocused

19  area of interest in certain topics.  Okay.  Another example might be

20  repetitive or continual review of certain books or certain type of

21  media or those types of things.  In restrictive and repetitive

22  patterns of behaviors, only two of the four examples that are given

23  are required to make that diagnosis.

24       They also elude to - and this isn't actually a diagnostic

25  criteria, but it is included as another point of reference - atypical

1   sensory types of input.  So being uncomfortable with light, sound,

2   tactile types of things like the types of clothing or sticky hands or

3   the way that something fits, the material.

4   Q.   Not to cut you off.  When you say tactile and things that, touch,

5   could those include like shoes and how they feel?

6   A.   Of course.

7   Q.   Would another -- you said how they fit, like how pants might fit?

8   A.   Uh-huh.  Loosely or more snuggly.  You know, and then textures.

9   So maybe the textures of food so that would be an oral motor type of a

10  texture.  The texture of the way maybe a wall feels or something if

11  you were to run your finger across it, those kind of things.  And then

12  lastly, an abnormal response to pain, abnormally high, abnormally low,

13  those would be examples of sensory function and atypical sensory

14  function.

15  Q.   When you talk about restrictive repetitive interests and

16  behaviors what kind of mentality is that coming from?  Why do you they

17  engage in that?

18  A.   In my opinion, the autistic type of a behavior comes from a

19  strong desire for information or data, if you would, related to the

20  environment.  That's different than socially analyzing your

21  environment or understanding the interaction between people.

22       If you remember, going back to my infant and toddler example,

23  one would explore the environment in an individual or solo type of a

24  process.  The other would explore the environment and ask questions of

25  maybe other human beings that they knew had knowledge of whatever

1    their question would be, those kind of things.  So one is very solo,

2    very independent, very information and data gathering.  The other is

3    interpersonal in the sense that they're exploring their environment as

4    well, but with the input of other human beings that understand or know

5    the environment.

6    Q.   And just to clarify.  The interpersonal method you're describing,

7    generally folks without autism?

8    A.   Correct.  People that are typically developing.

9    Q.   How do some of these deficits associated with autism affect

10   someone's demeanor or how they come off to people?

11   A.   Well, I think, you know, number one, when you're talking about

12   someone that is content to explore something in a solo or individual

13   fashion they don't come off as engaging or open to engagement.  In

14   fact, in young children with autism you will see them retaliate if

15   someone enters their space.

16   Q.   How about -- I apologize again.  How about adults with autism?

17   A.   So adults with autism a lot of times, because they're not good

18   with social understanding or interaction rules, they will be reserved,

19   somewhat detached, maybe even aloof or not -- appear not open to

20   interaction with other people or they can be space invading.

21         One of the things that happens when I evaluate someone with

22   autism is I need to see what understanding of social rules they have.

23   So for a small child I might go into their personal space.  And for

24   most of us if someone enters your personal space you kind of back up

25   or recoil or are kind of thinking, you know, what are they doing?  You

1  know, somebody, if they look threatening, they might even say, "Oh,

2  hey, I'm going to call the police. This person's," you know, "making

3  me uncomfortable," those kinds of things. But they're unaware of what

4  the rules are about interacting with other people socially that maybe

5  people understand intuitively.

6  Q.    Okay. Based on that opinion, does a layperson who may not be as

7  familiar with autism -- actually, I'm going to move on to another

8  question.

9          Now, every autistic person does not have the exact same --

10  does every autistic person have the exact same sets of deficits?

11  A.    Absolutely not. In fact, autistic people are so individual that

12  that's where some of the debate or the discussion in the field comes

13  from. In fact, one of the big debates right now is you have people

14  that are severely or profoundly visibly autistic that are upset with

15  the, quote-unquote, neurodivergent population which may look, for all

16  intents and purposes, to be functioning very, very well. But upon

17  further inspection their deficit becomes clear or more aware.

18  Q.    And how is it that certain autistic people may not,

19  quote-unquote, come off as autistic when they're an adult to others?

20  If they're autistic, how is it not obvious?

21  A.    I would say that higher-functioning individuals with autism use

22  a technique called "masking" or "camouflaging" and that is because of

23  their intellect and because of their ability to observe, they've

24  learned through being reprimanded or told so when they were younger

25  that this isn't right, this isn't appropriate, you're wrong. So

1   they've learned to, in a point of uncertainty, look around and see

2   what other people are doing and then either mirror or mimic or mask

3   their behavior by participating in a way that looks similar to others.

4   Q.   Is it possible -- I know you clearly have focused on early

5   childhood and points of that.  But is it possible for someone to be

6   diagnosed with autism as an adult that they weren't diagnosed as a

7   child?

8   A.   Absolutely.  In fact, it's much more common.  There's a lot more

9   research in the field now where we're recognizing -- when I started my

10  career when I was trained the incidence in autism was 4 in 10,000 or

11  roughly 1 in 500.  The CDC just released the new statistics for the

12  year 2020 this last week and the incidence is now 1 in 36 individuals

13  or about 3 percent of the population.  So, in essence, we've

14  discovered a much broader spectrum than what we once knew.  So as it

15  sits now, not only do the severe and profound people fit on the autism

16  spectrum, but people that are in certain areas relatively high

17  functioning or even superior in functioning can also have autism.

18  Q.   But why didn't they catch that earlier in their childhood for

19  those people that were diagnosed as adults?

20  A.   You know I think --

21              MS. FRENCH:  Objection; calls for speculation.

22              MR. YOUNG:  Your Honor, he's an expert in this field.

23              THE COURT:  He said something about just generally.

24              MR. YOUNG:  Generally speaking.

25              THE COURT:  Overruled.

1          THE WITNESS:  My belief is that as a society we set our

2   standards and we set our expectations on the way that people behave.

3   There's certain things, for instance, in the North American standard

4   that we look as appealing or pleasing.  Performance academically would

5   be one of those things.  Performance athletically would be one of

6   those things.  So if you have people that have areas of behavior that

7   are consistent with typical functioning or even areas of -- let's call

8   it areas of genius, in certain areas they can overlook areas that are

9   less developed or underdeveloped especially if individuals that are

10  higher functioning are masking or camouflaging some of those things

11  that are less known to them.

12  BY MR. YOUNG:

13  Q.   Now we're going to transition now to your evaluation of Mr.

14  Herrera.  Did there come a time in which you were hired to evaluate

15  Mr. Herrera?

16  A.   Yes.

17  Q.   And were you hired to evaluate him for autism?

18  A.   Yes.

19  Q.   Who hired you?

20  A.   I believe I was initially contacted by Michael Hutchinson who is

21  part of the Federal Defender Program and I was told that Caitlyn Wade

22  was the attorney and I was also told that you would be participating

23  on the case as well.

24  Q.   How much were you paid?

25  A.   In total?

1  Q.    Or by the hour.  Either way.

2  A.    My rate is $250 an hour to do assessment.  My rate for

3  appearance in court is $500 an hour or for deposition or in-person

4  type of testimony.  In total, I've been paid to date $7,000.

5  Q.    I was going to ask you how many hours you've billed and then hold

6  you to that.  Now, was the payment contingent upon you reaching a

7  particular conclusion?

8  A.    No.

9  Q.    We're going to go briefly - but this is important - through the

10 testings -- the various tests that you went through with Mr. Herrera

11 just to explain to the jury -- and this may be a time in which I would

12 rudely interrupt you a lot but we're going to try our best to get

13 through it.

14        Okay.  Let's talk about the Wechsler Adult Intelligence

15 Scale, Fourth Edition.  Did you perform that test on Mr. Herrera?

16 A.    I did.

17 Q.    Why?

18 A.    I wanted to make sure that I had an idea of his intellectual

19 capacity, his ability to function intellectually.

20 Q.    And why is that relevant to autism?

21 A.    Well, one of the things that we have to do is we have to look at

22 a person's potential or their ability to act in a way that other

23 people would act or would behave around other people.  What

24 intelligence tells us is whether or not an individual has an ability

25 to learn.

1    Q.    And what were Mr. Herrera's results?

2    A.    Mr. Herrera's results in the verbal domain which means -- this

3    is a verbally mediated test, by the way, which means question and

4    answer.  Okay.  But his verbal intelligence quotient was in the 120s.

5    I believe low to mid 120s.  His performance intellectual quotient,

6    which is nonverbal or has more to do with spatial and those types of

7    things, but things that are not verbal, was just below a hundred.  We

8    consider a split between those two domains of 10 points or greater to

9    be significant because it tells you that they -- the individual that

10   is tested has a preference for one style over the other.

11   Q.    What is the style you found Mr. Herrera preferred?

12   A.    He was significantly more verbally mediated.  In essence, he

13   wanted to use language or his understanding of language rather than to

14   use, say, things that were nonverbal such as how a pattern of blocks

15   are designed or how digits or numbers that are said to him he could

16   repeat back so that would be working memory, those types of things.

17   So he had a preference for using language and defining language and

18   the definitions of language to things that were not verbally given to

19   him.

20   Q.    And is that generally typical of people with autism?

21   A.    You know, there are all sorts of profiles so I couldn't say that

22   one is any more typical, but the split is significant, and I think the

23   split, or the uneven profile, is generally related to people -- they

24   don't have an even skillset.

25   Q.    Let's talk about executive functioning testing.  Did you do the

1  Wisconsin Card Sorting Test?

2  A.    I did.

3  Q.    What is that?

4  A.    The Wisconsin Card Sorting Test is a test that checks for a

5  person's ability to understand a pattern.  You have sets of cards and

6  they're set out for you.  His was administered on a computer.  There

7  are four of them.  They are matched on either the number of geometric

8  objects that are on the card, the color of the geometric objects that

9  are on the card, or the shape of the geometric objects.  After each

10  choice that you make of the card that's in front of you to place on

11  one of the four piles, the computer responds right or wrong and, with

12  that, you need to problem solve and switch your approach.  Okay.  If

13  it's not a color, it's number.  Okay.  If it's not number, it's shape.

14  Q.    What does that test tell you?

15  A.    What it tells me is his ability to problem solve and his ability

16  to be flexible cognitively.

17  Q.    And what were his results?

18  A.    His results were within the average range.

19  Q.    What is the learning and memory -- sorry.  We're going to talk

20  about learning and memory testing.  Did you do something called an

21  R-A-V-L-T?

22  A.    The Rey Auditory Verbal Learning Test, yes.

23  Q.    What does that tell you about someone?

24  A.    Someone's ability to take in an amount of verbal information, so

25  words, and then once the list is finished, to be able to give me back

1    those words right after I have given them the list.  So, in essence,

2    they're given the list -- the same list five times, okay, and they're

3    given the ability to respond being told that they should give me every

4    word each time -- if you've gotten one before, it doesn't mean omit

5    that word next time.  It means every word each time the list is given.

6    Q.   What did Mr. Herrera -- what was his results?

7    A.   His results were slow initially which to me was odd because he

8    has good problem solving and executive functioning.  But it picked up

9    after the second administration of the list and was well within the

10   average range by the end of the five times.  At the end of the five

11   times I then give what's called an interference list or a different

12   list of words.

13   Q.   And what does that tell you -- did that tell you about Mr.

14   Herrera?

15   A.   Again, his ability to take in information verbally and to give

16   you back that information which is a process of working memory or

17   memory that you would hold something in your mind and use that

18   information to respond to your environment required more chances, more

19   trials to learn initially.  But once that he had it in his mind, it

20   was better.  And the reason I knew that is after I do the interference

21   list I then ask him 20 minutes later "Remember that list that we went

22   over five times?  How many of those words can you tell me," and his

23   number on that was, again, well within the average range.

24   Q.   What does that tell you -- how does that relate to autism?

25   A.   So the idea is -- when you're taking in information, any of us,

1   whether you have autism or whether you don't, how quickly someone

2   learns information has to do with their ability to attend to

3   something, their ability to encode that for their mind and then their

4   ability to find that information once they've encoded it and stored it

5   and bring it back.  If it takes you longer to encode that information

6   or to understand the information attentionally to begin with, then

7   it's going to take you longer to learn the task or the activity that

8   we're talking about.

9   Q.    Generally speaking, where on that spectrum do autistic folks fall

10  on?

11  A.    They take longer.  We use a term in autism and autism research

12  called "overlearning" which means they do incredibly well with rote

13  information or memory that can be encoded and stored, but until the

14  memory is encoded and stored it takes them longer and more repetitions

15  to do that.

16  Q.    Do you do a processing speed testing?

17  A.    I did.  Processing speed is part of the intelligence testing and

18  his processing speed was within the average range.

19  Q.    What about adaptive functioning testing?

20  A.    I did.  I did the Vineland Adaptive Behavior test.  This is a

21  questionnaire that goes to someone that knows Mr. Herrera well so a

22  third party.  I chose his mother and she filled out that information

23  for me and the results are based on her responses to things like

24  communication, skills of daily living.  So hygiene, the ability to

25  shop, the ability to cook, the ability to drive, those types of

1    things, as well as negative behaviors such as the ability to be

2    independent versus to be dependent.  You know, if there were

3    inappropriate types of behavior like hitting, kicking, biting, those

4    types of things would be told on that test as well.

5    Q.    Now, you mentioned interviewing someone to do that test?

6    A.    Uh-huh.

7    Q.    Is interviewing someone to do that test something folks in your

8    field do routinely?

9    A.    Yes.  Not only for functionality testing but any time that

10   you're considering an autism diagnosis third-party input is critical.

11   You have to have it because you can't be sure that the individual that

12   is being assessed for autism is perceiving things the way that

13   everybody else does because we talked about, again, starting very

14   early in their life how they perceived their environment differently,

15   those types of things.

16   Q.    Now, you don't know whether what this third party tells you is

17   true or not?

18   A.    I do not.

19   Q.    But you rely on it anyways?

20   A.    No question.

21   Q.    And do folks in your field rely on that also?

22   A.    Correct.

23   Q.    What were the results of the adaptive functioning testing?

24   A.    The adaptive functioning testing in the communication domain,

25   his mom rated him as within the average range, okay.  In his

1    community, or daily living skills, again, well within the average

2    range.  But in his socialization domain, interestingly, he was almost

3    two standard deviations.  I'll break that down because I know that

4    that is a statistical term.  He was almost two groups below average in

5    his socialization domain which would be things like interaction with

6    other people, the types of activities and tasks that he enjoys, those

7    types of things.

8    Q.    Let's talk about the assessment of autism symptomology and social

9    functioning.  Let's try to get through these.  You had the Social

10   Communication Questionnaire?

11   A.    Yes.

12   Q.    You used that with Mr. Herrera?

13   A.    It was actually given to his mother.  Again, this is a screening

14   test to see whether further evaluation should be done and so it's

15   what's called a threshold test.  What the "threshold" means is if you

16   achieve a certain number of points, then more assessment is indicated.

17   The threshold score on the Social Communication Questionnaire can be

18   done over the lifetime or currently.  I asked her to do it for Mr.

19   Herrera's current functioning and the threshold score is 15.  So 15 or

20   greater would require more assessment.  Mr. Herrera's mother scored

21   Mr. Herrera's current social communication functioning on the

22   questionnaire at 22.

23   Q.    What is the Baron-Cohen Forced Choice?

24   A.    Baron-Cohen Forced Choice Test is under the autism quotient and

25   the empathy quotient.  For the autism quotient, it would require you

1   to score 32 points or higher.  Again, a screening test to say, you

2   know, if the individual that it's given to and it can be given both

3   with the individual with autism as well as to a caregiver.

4   Q.   And what were the results?

5   A.   I gave this to Mr. Herrera directly because I wanted his input

6   as to his awareness about his differences and he scored much higher

7   than 32 so above the threshold indicating he felt like he had some

8   autism types of symptomatology and behavior.  And then the empathy

9   quotient is one where the threshold score you need 30 in order to show

10  that there is empathy or you believe you have empathy and he did not

11  get a score of 30, he was below that threshold.

12  Q.   What is the Autism Diagnostic Observation Schedule?

13  A.   Excuse me.  The Autism Diagnostic Observation Scale is a

14  semistructured assessment where you're given certain types of tasks

15  that would elicit autism type of symptomatology or autism type of

16  thinking or autism type of behavior.

17  Q.   And what were the results for those?

18  A.   I need to just finish on that thought.

19  Q.   I apologize.

20  A.   Dr. Cathy Lord, who is a highly respected researcher in the

21  field, created this test so that individuals of all ages could be

22  given this test.  Now, when you give this test there are four

23  different modules.  The highest module, being Module 4, is for people

24  with relatively intact language or language that is conversational and

25  it usually is used with either adolescents or older individuals.  I

1  gave this test to Mr. Herrera and he scored within the autism spectrum

2  disorder range.  So the scoring can be not autistic, autism spectrum

3  disorder, or autistic and he scored within the autism spectrum

4  disorder.

5  Q.    Just two more.  What is the Social Attribution Animation Test?

6  A.    The Social Attribution Animation Test is a video that an

7  individual is shown that shows geometric shapes that are interacting

8  in a certain way.  There is a square, a large square, a circle, a

9  triangle, and a diamond.

10  Q.    What does it tell you about the person?

11  A.    It tells me how they process two-dimensional information.  This

12  was used in the Yale Child Test.  The instructions initially are what

13  do you see in the video clip and it's roughly 10 seconds long, they

14  can watch it as many times as they'd like to.

15  Q.    How do folks with autism, generally speaking, respond to the test

16  compared to folks that don't have autism?

17  A.    In a very literal sense, they name the geometric object and tell

18  what's happening.  So one of them is called bumper cars.  These are

19  the names that were given them.  But it's basically the small or

20  geometric shapes chasing each other.  Another one is called physical

21  and it's basically if any of you -- it looks like some of you are my

22  age.  Remember the game Pong?

23  Q.    Which is very young.

24  A.    Yes, of course.

25        Which, you know, things are bouncing off the sides and those

1    kind of things kind of like a screen saver type of thing and then the

2    last one has one of the shapes in the middle of the square pushing the

3    side of the square to get out and two other shapes that look like

4    they're conversating or interacting and when the shape gets outside

5    and comes down the two at the bottom split.

6          And so then after they do that first round you then give

7    them a separate set of instructions and you say, okay, if these were

8    people and they were doing what you see on the screen how would that

9    change the story you give me?  And, again, you don't get the same

10   robust interactive type of language that you would get with someone

11   from a typical-developing background.  They simply, again, are not as

12   aware of or conversant in interactive feelings or those types of

13   things.

14   Q.   Lastly, what is the Reading the Mind in the Eyes Test?

15   A.   This, again, was done by Simon Baron-Cohen over at Cambridge who

16   is Sir Simon Baron-Cohen.  He was knighted by the last queen.

17   Q.   Not Sasha Baron-Cohen?

18   A.   Which, interestingly, is his first cousin.  I would pay good

19   money to be a fly on the wall of their family reunions because you

20   have a very, very formal, very, very stiff person and the comic Sasha

21   Baron-Cohen.

22   Q.   I apologize.  So what is the Reading of the Mind in the Eyes

23   Test?

24   A.   In essence, think of the medieval eye check in the door type of

25   thing where they slide it and you can only see the eyes, okay.  But

1    then on each corner of that there are four different adjectives and it

2    says what is the emotion of this person based on the eyes.

3    Q.    And how did Mr. Herrera perform on this?

4    A.    He scored in the autism range on this.  His score was 22 out of

5    36.

6    Q.    Are you familiar with the term "malingering"?

7    A.    Yes.

8    Q.    What does that mean?

9    A.    "Malingering" means feigning or trying to deceive another

10   individual based on the way that you appear or that you behave.

11   Q.    Did you do any tests to determine whether Mr. Herrera was

12   malingering during these tests?

13   A.    I did.  I did a test called the Test of Memory or Malingering or

14   the TOMM.

15   Q.    And what were the results of those?

16   A.    This test is very sensitive to malingering and what it is is

17   you're given -- you're asked to look at 50 different objects that are

18   familiar to everyone and to name them and then you're shown 50

19   different stimulus with two objects, A or B, and asked which one

20   you've seen before.  In the case of all individuals, with the

21   exception of people that have acquired or traumatic brain injuries,

22   exceptionally high scores are expected and Mr. Herrera achieved a

23   perfect score on both the first and second trial.

24   Q.    And what did the result of that test tell you about the

25   reliability of the other test results?

1    A.    That told me that Mr. Herrera was conducting himself in a manner

2    that was straight forward.

3    Q.    And what was your ultimate diagnostic conclusion of Mr. Herrera

4    based on these results?

5    A.    I believe, looking at the test results, that Mr. Herrera has an

6    autism spectrum disorder because his profile fits with the way that

7    his testing results presented.

8    Q.    Did you -- can you give me one second.

9          Okay.  Let's transition now to your interview of Mr. Herrera

10   himself.  We're not going to focus on anything he said to you, okay,

11   I'm not asking you about that.  What did you observe about the manner

12   in which Mr. Herrera communicates with you?

13   A.    Excuse me.  Mr. Herrera has -- or presented with several

14   different traits or behavior that are consistent with an autism

15   spectrum disorder.  His initial presentation to me was obviously

16   anxious and nervous, which isn't uncommon when someone's coming to see

17   me.  His eye contact was not consistent, but it got better as he

18   became more -- I wouldn't say comfortable but more familiar with the

19   types of tasks and activities that we were doing.

20   Q.    What was the pace and tone of his verbal communication style?

21   A.    He was very monotone.  There wasn't a lot of inflection in his

22   voice so I would say his tone was very flat.  His rate of speech was

23   fast which, you know, there were times when I had to ask him to repeat

24   things or to say something again because his language was particularly

25   fast.

1    Q.    In your experience and opinion, is that way of speaking common or

2    prevalent in folks with autism, generally?

3    A.    Again, you know, you can't say one way or another because

4    everything is individualized and each profile is different.  But I

5    would say that it would be indicative of autism from the standpoint

6    that maybe he wasn't as concerned about my understanding or receiving

7    the language.  He wasn't checking in that way.

8    Q.    When you say he wasn't "checking in," what do you mean?

9    A.    He wasn't watching me.  He wasn't looking at me in particular

10    for how I was receiving the information.  You know, he definitely was

11    giving information, but it didn't appear that he was trying to check

12    for comprehension or understanding.

13    Q.    Check for comprehension and understanding from you?

14    A.    From me, correct.

15    Q.    I think you mentioned eye contact.  I'm going to focus on

16    nonverbal communication.

17    A.    Okay.

18    Q.    Were there any other kind of nonverbal communication styles you

19    noticed from Mr. Herrera?

20    A.    His body posture was quite stiff.  His hands -- he appeared to

21    be restricting the movement of his hands by, you know, keeping his

22    hands clasped tightly together, those types of things.  You know,

23    there was movement in one of his legs which, to me, is an indication

24    of hyperkinetic type of energy or a central nervous system maybe

25    that's a little bit overwhelmed and needing to get energy out.

1    Q.    Do you believe that -- in your opinion, does stress impact Mr.

2    Herrera's ability to communicate?

3    A.    Absolutely.

4    Q.    How?

5    A.    In a negative way.  I believe that he is conflict avoidant and

6    that he is passive in most situations because he doesn't process

7    information communicatively, interpersonally between individuals while

8    in the moment.

9    Q.    What do you mean by "passive" in communication?

10   A.    Which means he would be more apt or more likely to acquiesce or

11   be permissive in any given interaction plain and simply because,

12   number one, he wants to avoid conflict but, number two, he doesn't

13   process the information well in the moment.

14   Q.    Do you believe that in your experience that the stress of a trial

15   for instance, could affect demeanor?

16   A.    It affects mine.  I'm sure it affects Mr. Herrera's.

17   Q.    How?

18                   MS. FRENCH:  Objection, Your Honor; speculation.

19                   THE COURT:  Sustained.

20   BY MR. YOUNG:

21   Q.    Let's focus on collateral interviews.

22   A.    Sure.

23   Q.    Now, you mentioned doing a collateral interview with his mother.

24   Did you do any other collateral interviews?

25   A.    I did a collateral interview with a former girlfriend that he

1    had a relationship for roughly six years.  I believe exactly it was

2    five years and 10 months.  Her name was Raina.

3    Q.    And why did you select these two people to interview to the

4    extent you haven't already explained it?

5    A.    Because of their nature and also length of relationship.  They

6    had what I would consider longer term relationships and spent time

7    with him in more personal or private settings.

8    Q.    Just for clarity of the record -- because before we were just

9    talking about your mom -- the type of collateral interview you did of

10   his girlfriend, did that also fall into the nature of things that

11   folks in your profession typically do in these assessments?

12   A.    Yes, they do.  They do third-party interviews of people that

13   have good working knowledge of the person that's being evaluated for

14   autism.

15   Q.    Let's focus now and transition to the types of autistic traits or

16   characteristics that you found specifically in Mr. Herrera, okay.

17   What were some of the traits of autism that you found in Mr. Herrera?

18   A.    He appeared to not understand the social nature of relationships

19   and, if I may, I'd like to give a couple examples from the history.

20   Q.    Let me say -- let me back up a second.  In the course of your

21   evaluation were you presented with what you believe are the facts of

22   this case?

23   A.    Yes.

24   Q.    Did you do any independent verification of whether any of these

25   facts were true?

1    A.    I did not.

2    Q.    So when you do give examples -- if you give examples that are

3    based on the facts of this case, they're the facts as you understand

4    them to be true?

5    A.    Correct.

6    Q.    Not through your own independent verification?

7    A.    That is correct.

8    Q.    Thank you.

9          Please go ahead and give an example of the trait that you

10   were just describing.

11   A.    Okay.  So starting back when he was in the Philippines with his

12   mother - so he would have been younger than third grade - at which

13   point he emigrated to Canada and then to New York state to the Bronx,

14   I believe, there were traits and behaviors that were reported that

15   were consistent with a young child with autism so sensory differences.

16         MS. FRENCH:  Objection, Your Honor.  We're now lapsing

17   into hearsay.

18         MR. YOUNG:  Your Honor, under Rule 703 we've established

19   a sufficient foundation that the facts and data that he's relying on

20   to give his expert conclusion are the types of facts and data that

21   folks in his field rely on.  And he's not offering this hearsay for

22   the truth, we made it clear, these are the facts as he's been told and

23   the jury is allowed, under Rule 703, to use these underlying facts and

24   data to assess the credibility of Dr. Whitney.

25         MS. FRENCH:  Under Rule 703, these facts could only be

1    disclosed to the jury if their probative value substantially outweighs

2    their prejudicial value.  These were not independently verified facts,

3    they're only rooted in hearsay, makes their value less probative and

4    more prejudicial.

5            THE COURT:  This is about his childhood?

6            MR. YOUNG:  Yes.  Right now it is.

7            THE WITNESS:  Childhood going into middle school going

8    into high school going into college.

9            THE COURT:  All right.  Well, I'll allow it for that

10    purpose.

11        Ladies and gentlemen, you're not to accept the underlying

12    facts as true.  They're simply facts that were provided to Dr. Whitney

13    for the purpose of rendering his opinion, but you're not to accept

14    those facts as true.

15    BY MR. YOUNG:

16    Q.   Go ahead, Dr. Whitney.  Just a couple of examples.

17    A.   Okay.  So going back to the idea that he was in school in the

18    United States – so this is roughly third or fourth grade.  He had not

19    done well in peer relations prior to coming to the United States so

20    one of the things Mr. Herrera did, according to his mother, was the

21    family had a home business that was a garage, a repair shop, so to

22    speak, and he took $20 bills to school and gave them to peers in his

23    classroom and this was reported from the mother finding out about it

24    from the teacher in an attempt, I believe, to make friends because he

25    ascertained that he liked money, therefore, people his age would like

1   money so he was trying to make friends by doing that.

2   Q.   What other traits did you observe in Mr. Herrera consistent with

3   autism?

4   A.   One of the other things that is very interesting is Mr.

5   Herrera's relationships even going further -- going forward have poor

6   communication socially.  There was a gentleman that was reported by

7   the mother to have harassed or bullied him in middle school.  In early

8   high school Mr. Herrera threatened the gentleman and then hit him in

9   the chest at which point he was sent to juvenile court for this and

10  the response to this, when his mother asked him, was "I had taken it

11  for as long as I could and I was in high school.  I had to stand up

12  for myself or this wouldn't stop."

13  Q.   What other traits did you observe consistent with autism in Mr.

14  Herrera?

15  A.   And then passively what he learned when he got to college was

16  that if he was of value to other people -- so, for instance, one of

17  the girls that he dated for several years in college graduated two

18  years before him, even starting at the same time, and I was told by

19  his mother that he had done a lot of her coursework for her and she

20  went on to graduate school.

21  Q.   Were there any other -- without getting into examples, unless I

22  direct you to, were there any other traits that you observed in Mr.

23  Herrera consistent with autism?

24  A.   Mr. Herrera has a tendency to think in a black and white manner

25  so something either is or isn't.  So if he were to have a negative

1   experience he would look at interaction in a similar way.  So if he

2   had a negative experience, say, with an individual or if he had a

3   negative experience with people in general, he would be mistrusting.

4   Mr. Herrera is distrusting of other people because he had negative

5   experiences growing up.

6   Q.    Thank you.  Hold on one second, please.

7         Without giving examples, unless I ask you to, were there any

8   other traits that you observed in Mr. Herrera that you haven't

9   mentioned?

10  A.    Repetitive types of behaviors would include re-watching certain

11  movies, re-reading certain books over and over and over again, as well

12  as internet use for getting information, playing video games from a

13  very young age.  He spent a lot of time by himself and those solo

14  pursuits were on the internet playing video games.

15  Q.    Thank you.  Was there a -- are you familiar with the concept of

16  theory of mind?

17  A.    Yes.

18  Q.    What is that?

19  A.    Theory of mind is defined as a person's ability to actively

20  interpret or judge another person's mental state so possibly their

21  thoughts, feelings, and ideas.

22  Q.    And how does that relate to autism?

23  A.    People with autism are said to have an inability to do this.

24  They don't do this well and so intuitively they don't understand

25  people very well.

1   Q.   Can you explain more about -- and I apologize if I missed what

2   you just said.  When you say they don't intuitively understand people

3   well -- I guess can you elaborate a little bit?

4   A.   Sure.

5   Q.   Yeah.

6   A.   To give an example of Mr. Herrera, he loves his mother very

7   dearly and yet he never has given her any card for her birthday, has

8   never given her a card on Mother's Day, and doesn't think of her

9   needs, wants, desires, those kinds of things.  Yet he will vehemently

10  tell you, and probably has, that he loves her very dearly.

11  Q.   And how is that related to autism?

12  A.   When you think about it, if you care about someone you try to

13  think about their needs, wants, and desires and one of the things that

14  you would do is you would say if someone's having a special occasion

15  that I care about, I would do something nice for them, something

16  special for them.

17  Q.   I'm going to now focus on the facts of this case you understand

18  them to be.  Okay.  Is it your understanding that at some point Mr.

19  Herrera was on a website called Fetlife?

20  A.   Yes, that is my understanding.

21  Q.   Can that behavior of him going on Fetlife be consistent with

22  traits related to autism without telling us whether you think he

23  actually did it for whatever reason, because you don't know, can that

24  be consistent with traits of autism?

25  A.   It can be.

1     MS. FRENCH:  Objection; violates the Court's order.

2     THE COURT:  Sustained.

3     MR. YOUNG:  Okay.  Give me one second, Your Honor.  Let

4  me just have a minute, Your Honor, to confer with co-counsel.

5     THE COURT:  Sure.

6  BY MR. YOUNG:

7  Q.   Is the act of going online -- is the hypothetical act of going

8  online to meet others to learn more about kinks and fetishes

9  consistent with someone who has autistic characteristics?

10     MS. FRENCH:  Objection; violates the Court's order.

11     THE COURT:  It's objectionable for a number of other

12  reasons.  Sustained.

13     MR. YOUNG:  No further questions, Your Honor.

14     THE COURT:  All right.  Anyone need a restroom break?

15  All right.  Let's take a recess.  Be back at 12:30.

16               (Out of the presence of the jury)

17     THE COURT:  Please don't discuss your testimony with any

18  attorney during the break.  Be back at 12:30.  Thank you.  We're in

19  recess.

20            (recess was taken from 12:19 p.m. until 12:30 p.m.)

21     THE COURT:  Ladies and gentlemen, I promise you we'll

22  take a lunch break, as well.  I'm thinking just because we started a

23  little later we'll have lunch a little later.  I'll let you go no

24  later than 1:00 o'clock because the cafeteria downstairs closes at

25  1:30.  I didn't want you to be wondering if that's going to happen.

# DOC. # 147 JUDGMENT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| | ) | |
| v. | ) | Case Number:   1:20-CR-079-SDG |
| | ) | USM Number:   73006-019 |
| JOSHUA REUBEN HERRERA | ) | |
| | ) | Adam Hames |
| | ) | Defendant's Attorney |

The defendant was found guilty by jury trial on Count One after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 2422(b) | ENTICEMENT OF A MINOR | January 16, 2020 | 1 |

The defendant is sentenced as provided in pages 1 through 7 of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States Attorney of material changes in economic circumstances.

October 26, 2023
_____
Date of Imposition of Judgment

_____
Signature of Judge

STEVEN D. GRIMBERG, U. S. DISTRICT JUDGE
_____
Name and Title of Judge

October 27, 2023
_____
Date

DEFENDANT:  Joshua Reuben Herrera
CASE NUMBER:  1:20-CR-079-SDG                                                    Judgment -- Page **2** of **7**

Judgment in a Criminal Case
Sheet 2 -- Imprisonment

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:  **235 MONTHS.**

The defendant is remanded to the custody of the United States Marshal.

It is RECOMMENDED that:

     (a)  defendant be evaluated and, if appropriate, designated to a facility that offers the BOP Skills Program; and

     (b)  defendant be designated to a facility as close to Atlanta, Georgia as practicable.

## RETURN

I have executed this judgment as follows:

_____

_____

_____

_____

_____

Defendant delivered on  _____  to  _____

at  _____ , with a certified copy of this judgment.

_____
                                  UNITED STATES MARSHAL

_____
                         DEPUTY UNITED STATES MARSHAL

DEFENDANT:  Joshua Reuben Herrera
CASE NUMBER:  1:20-CR-079-SDG

Judgment -- Page **3** of **7**

Judgment in a Criminal Case
Sheet 3 -- Supervised Release

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:  **Life.**

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
4.  You must cooperate in the collection of DNA as directed by the probation officer.
5.  You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq*.) as directed by the probation officer, the Bureau of Prisons, and any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense.

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

DEFENDANT:  Joshua Reuben Herrera
CASE NUMBER:  1:20-CR-079-SDG                                    Judgment -- Page **4** of **7**

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision.  These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so.  If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity.  If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction.  The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

**U.S. Probation Office Use Only**

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see Overview of Probation and Supervised Release Conditions, available at:  www.uscourts.gov

I understand that a violation of any of these conditions of supervised release may result in modification, extension, or revocation of my term of supervision.

Defendant's Signature    _____    Date   _____

USPO's Signature    _____    Date   _____

DEFENDANT:  Joshua Reuben Herrera
CASE NUMBER:  1:20-CR-079-SDG

Judgment -- Page **5** of **7**

## SPECIAL CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following special conditions of supervision.

You must actively participate in a sex offense specific evaluation at a program approved by the U.S. Probation Office.  You must pay all or part of the costs of the evaluation based on your ability to pay unless excused by the probation officer.

You must participate in a sex offense specific treatment program and follow the rules and regulations of the program. The program must be approved by the U.S. Probation Office.  The probation officer will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).  You must pay all or part of the costs of the program based on your ability to pay unless excused by the probation officer.

You must not view or possess any 'visual depiction' (as defined in 18 U.S.C. § 2256), including any photograph, film, video, picture, or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of 'sexually explicit conduct' (as defined in 18 U.S.C. § 2256).

You will have no contact, whether directly in person or indirectly through any means of communication, with any child under the age of 18, nor with any person unable to give consent due to mental or emotional limitations unless you have permission from your probation officer. If you do have incidental contact with any child under the age of 18, or with any person unable to give consent due to mental or emotional limitations you shall immediately remove yourself from the situation.  You must report any such contact to the probation officer within 24 hours and submit a written description of the incident to the probation officer within 72 hours.

You must cooperate with the United States Probation Office in the monitoring of any computer system, internet capable devices, and/or similar electronic devices that you have access. Cooperation includes, but is not limited to, identifying computer systems, internet capable devices, and/or similar electronic devices (as defined in 18 U.S.C. § 1030(e)(1)) to which you have access and allowing the installation of monitoring software/hardware on said devices. You and/or your probation officer shall inform all parties that access a monitored computer or similar electronic device that the device is subject to search and monitoring. You may be limited to possessing only one personal internet capable device to facilitate your probation officer's ability to effectively monitor your internet related activities. You must not remove, tamper with, reverse engineer, or in any way circumvent installed software. You must provide passwords for said computer systems. If able, you must pay the cost of monitoring unless excused by the probation officer.

To ensure compliance with the computer monitoring condition, you must allow the probation officer to conduct initial and periodic unannounced searches of any computers, computer systems, internet capable devices, and similar electronic devices (as defined in 18 U.S.C. § 1030(e)(1)) subject to monitoring. These searches shall be conducted for the purpose of determining whether the computer contains any prohibited data prior to installation of the monitoring software; to determine whether the monitoring software is functioning properly after installation; and to determine whether there have been attempts to circumvent the monitoring software after installation.

Pursuant to 18 U.S.C. §§ 3563(b)(23) or 3583(d)(3), and because you are a felon and required to register under the SORNA, you must submit your person, and any property, house, residence, vehicle, papers, computer, other electronic communications or data storage devices or media, and effects to search at any time, with or without a warrant, by any law enforcement or probation officer with reasonable suspicion concerning a violation of a condition of supervised release or unlawful conduct, and by any probation officer in the lawful discharge of the officer's supervision functions.

DEFENDANT:   Joshua Reuben Herrera
CASE NUMBER:  1:20-CR-079-SDG                                                    Judgment -- Page **6** of **7**

You shall permit confiscation and/or disposal of any material considered to be contraband or any other item which may be deemed to have evidentiary value of violations of supervision.

DEFENDANT:  Joshua Reuben Herrera
CASE NUMBER:  1:20-CR-079-SDG

Judgment -- Page **7** of **7**

Judgment in a Criminal Case
Sheet 5 -- Criminal Monetary Penalties

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties below.

Special Assessment

TOTAL       $100.00

The Court finds that the defendant does not have the ability to pay the JVTA** special assessment, a fine or costs of incarceration. The Court waives the JVTA special assessment, fine and costs of incarceration in this case.

Fine

TOTAL       $0

**Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.

<u>CERTIFICATE OF COMPLIANCE AND SERVICE</u>

This is to further certify that I have this day served a copy of the foregoing

Record Appendix upon:

> Lawrence Sommerfeld, A.U.S.A.
> Jesika D. French, A.U.S.A.
> United States Attorney's Office

through the electronic filing system of this Court.

Respectfully submitted this 23rd day of February, 2024.

> /S/ *Adam M. Hames*__
> ADAM M. HAMES
> Georgia State Bar Number: 320498
> The Hames Law Firm, LLC
> 511 East Paces Ferry Road, N.E.
> Atlanta, GA 30305
> (404) 842-9577